[Civ. No. 15135. First Dist., Div. One. Aug. 18, 1952.]

FRANCIS J. COLLINS, Appellant, v. CITY AND COUNTY
OF SAN FRANCISCO et al., Respondents.

H. Ward Dawson, Jr., for Appellant.

Dion R. Holm, City Attorney, and George E. Baglin, Deputy City Attorney, for Respondents.

PETERS, P. J.—Plaintiff, as an employee of the city and county of San Francisco, brought this action on his own behalf and on behalf of some 7,835 other employees similarly situated, to have it determined that the salary standardization ordinance passed by the board of supervisors in 1950 was improperly submitted to a referendum. At that referendum the ordinance was rejected by the voters. The action seeks a declaration of the validity or nonvalidity of the referendum, and, if the referendum is held to have been invalid, then an order requiring the payment to all civil service employees

affected of the salaries they would have received under the rejected ordinance. The trial court sustained a demurrer without leave to amend. The plaintiff appeals.

Before considering the appeal on its merits, there are certain preliminary points to which reference should be made. First, it must be determined if the appeal has been taken from an appealable order. The notice of appeal recites that the appeal is taken from "the minute order sustaining the demurrer of defendants without leave to amend made herein on May 31, 1951, and entered herein June 1, 1951, and from the whole thereof." █ It is hornbook law that the order sustaining a demurrer is interlocutory, is not appealable, and that the appeal must be taken from the subsequently entered judgment. (*Weiss* v. *Garofalo,* 89 Cal.App.2d 811 [201 P.2d 845]; *Hardy* v. *San Fernando Valley C. of C.,* 99 Cal.App.2d 572 [222 P.2d 314]; *Sturgeon* v. *City of Hawthorne,* 106 Cal.App. 352 [289 P. 229]; *Cornic* v. *Stewart,* 179 Cal. 242 [176 P. 164].) █ Of course, the appellate courts have "no power to make appealable an order which is nonappealable. The problem is one of jurisdiction. If appellants appealed from a nonappealable order we cannot remedy the defect. We cannot consider an appeal where none was taken." (*Schmidt* v. *Townsend,* 103 Cal.App.2d 185, 186 [229 P.2d 488].)

█ But the court has the power of interpretation. "Where it is perfectly apparent, as it is here, that appellant seeks a review of an order of dismissal, and where, as here, the notice of appeal is filed in ample time from either the entry of the order or judgment, and where, as here, the notice of appeal is addressed to all respondents and to their attorneys so that no one is misled, and where, as here, no prejudice to respondents exists, the notice of appeal should be treated as being from the appealable order even if the notice incorrectly designates the 'order' as a 'judgment,' and erroneously gives the date of the entry of the judgment rather than that of the order. It is therefore held that the notice of appeal is effective as to all respondents." (*Holden* v. *California Stab. Com.,* 101 Cal.App.2d 427, 431 [225 P.2d 634].) █ As also pointed out in that case, notices of appeal should be liberally construed to permit, if possible, a hearing on the merits. Many cases are there cited to illustrate that in applying this liberal rule, courts have frequently construed the word "order" to mean "judgment," and vice versa. In *Estate of Stone,* 173 Cal. 675 [161 P. 258], there was an

incorrect designation of the proceeding appealed from, and a wrong date in the notice. Nevertheless, the court, by liberally construing the notice, permitted the appeal to be effective. (See, also, *Airline Transport Carriers, Inc.* v. *Batchelor,* 102 Cal.App.2d 241 [227 P.2d 480]; *People* v. *Saad,* 105 Cal. App.2d Supp. 851 [234 P.2d 785].)

In the present case the order sustaining the demurrer was filed June 1, 1951. The judgment was entered June 29, 1951. The notice of appeal was filed July 23, 1951. Thus the notice was filed within 60 days of the entry of either the judgment or the minute order. All of the other requirements enumerated in the quotation from the Holden case are here present. That being so, although the notice of appeal incorrectly describes the judgment as a "minute order," and erroneously gives the date of the minute order rather than the date of the judgment, we will treat the appeal as being from the appealable judgment.

The second objection of respondents to the consideration of this appeal on its merits is that in a declaratory relief action such as this the trial court may refuse to entertain jurisdiction where the amount claimed by the petitioning party is $300, or less. It is urged that the order sustaining the demurrer without leave to amend should be interpreted as an exercise of the discretionary power of the court conferred upon it by section 1061 of the Code of Civil Procedure.

There is no doubt, insofar as Mr. Collins is concerned, that the amount he would receive in the event the relief prayed for is granted is $300 or less. There is also no doubt but that some discretion is granted to the trial court in declaratory relief actions. Section 1061 of the Code of Civil Procedure provides: "The court may refuse to exercise the power granted by this chapter in any case where its declaration or determination is not necessary or proper at the time under all the circumstances." There are cases that hold that the lack of the requisite jurisdictional sum is a factor that the trial court may consider on a motion to dismiss. (*Simpson* v. *Security First Nat. Bank,* 71 Cal.App.2d 154 [162 P.2d 494]; *A. Hamburger & Sons, Inc.* v. *Kice,* 129 Cal.App. 68 [18 P.2d 115].) The Simpson case even holds that the exercise of this discretion can be properly undertaken upon consideration of a demurrer.

These cases, however, have no application here. ██ That is so because, even though a trial court may exercise its discretion to deny relief in such an action by sustaining a demurrer

without the right to amend, it must appear directly or indirectly that such discretion was in fact exercised. In the instant case the record demonstrates that the denial of relief was not based upon the discretion of the trial judge, but was based upon the merits of the controversy. On May 31, 1951, a simple minute order sustaining the demurrer was filed. On June 1, 1951, the trial court filed a formal order sustaining the demurrer. This order is, in fact, a detailed opinion fully disclosing the reasons why, in the opinion of the judge, the demurrer should be sustained. That opinion fully and fairly discloses that relief was denied on the merits, and not in the exercise of any discretion. While a trial judge may deny relief in his discretion, it cannot be inferred that such discretion has been exercised where the trial judge, by opinion, fully discloses that he did not exercise any discretion, but decided the case on its merits.

There are other answers to this contention. ■■ While appellant Collins asks for himself but $300 in monetary relief, it is obvious, and the complaint so alleges, that this is a class suit brought on behalf of some 7,835 other employees similarly situated. The amount in controversy far exceeds $300.

■■ Moreover, this is not a simple action by Collins to recover a $300 judgment. He does not seek a judgment against anyone for that or any other sum. There is no prayer for money relief. What Collins seeks is an order compelling the controller to pay the proper salaries to him and to the other employees. This is either an equitable form of relief or a request for mandamus, which, in either event, is within the jurisdiction of the superior court, so that the question of the amount in controversy does not arise at all.

■■ The last jurisdictional question raised by respondents is that a prior suit for a writ of mandate brought by another party to stop the election here involved, and which was denied by the Supreme Court without an opinion, is res judicata of the entire controversy. It appears that just prior to the referendum election, one Ivan Flamm, as a taxpayer, filed in the Supreme Court a petition for a writ of mandate against Thomas A. Toomey, as registrar of voters, seeking in that fashion to prevent the referendum. The petition was denied without opinion. It is now well settled that the denial of an application for a prerogative writ will not be considered to be a denial on the merits and so res judicata, if any other possible ground for denial exists. ''If there is any other possible ground other than the merits upon which the denial

of the petition for a writ could have been based, such denial is not res judicata of the merits in a subsequent proceeding." (*McDonough v. Garrison*, 68 Cal.App.2d 318, 327 [156 P.2d 983].)

An examination of the Flamm petition discloses that it was filed by a taxpayer. Perhaps the Supreme Court, rightly or wrongly, believed that was not sufficient interest to warrant granting the writ. That alone presents a possible ground of denial that prevents such denial being res judicata in this proceeding.

Moreover, the same parties were not involved in the prior proceeding as are involved in the instant one. An examination of the Flamm record (of which we may take judicial notice—*Corum v. Hartford Acc. & Indem. Co.*, 67 Cal.App.2d 891 [155 P.2d 710]) discloses that Flamm was suing as a taxpayer and that the action was not a class action.

In addition, it is doubtful if the defense of res judicata may be raised by demurrer. Normally, one relying on such a defense must plead it. (See cases collected 15 Cal.Jur. p. 208, § 230.)

For these, and other, reasons the Flamm proceeding cannot be held to be res judicata.

That brings us to the merits of this controversy— Is a salary standardization ordinance subject to a referendum under the San Francisco charter?

The state Constitution, article IV, section 1, provides, in part: "The initiative and referendum powers of the people are hereby further reserved to the electors of each county, city and county, city and town of the State to be exercised under such procedure as may be provided by law. Until otherwise provided by law, the legislative body of any such county, city and county, city or town may provide for the manner of exercising the initiative and referendum powers herein reserved to such counties, cities and counties, cities and towns, but shall not require more than 15 per cent of the electors thereof to propose any initiative measure nor more than 10 per cent of the electors thereof to order the referendum. Nothing contained in this section shall be construed as affecting or limiting the present or future powers of cities or cities and counties having charters adopted under the provisions of Section 8 of Article XI of this Constitution. In the submission to the electors of any measure under this section, all officers shall be guided by the general laws of this State, except as is herein otherwise provided. This section is self-

executing, but legislation may be enacted to facilitate its operation, but in no way limiting or restricting either the provisions of this section or the powers herein reserved.''

The San Francisco city charter, section 179, provides, in part:

''The registered voters shall have power to . . . reject at the polls, any ordinance, act or other measure which is within the power conferred upon the board of supervisors to enact, . . .

''If, before the time any other ordinance involving legislative matters becomes effective, there shall be filed with the board of supervisors a petition signed by qualified electors . . . [Procedure for referendum is then set forth.]

''Annual budget and appropriation ordinances, supplemental appropriation ordinances, the annual salary ordinance, or ordinances amending the same, the ordinances levying taxes, any ordinance appropriating money from the emergency reserve fund, ordinances authorizing the city attorney to compromise litigation, and ordinances necessary to enable the mayor to carry out any of the powers vested in him in the case of a public emergency as defined in section 25 of the charter, ordinances enacted pursuant to section 219 of the charter, as well as ordinances relative to purely administrative matters, shall not be subject to referendum.''

In order to ascertain whether either or both or neither of these provisions authorize a referendum on a salary standardization ordinance, reference must be made to the long and complex provisions of the charter providing for salary standardization. The key section is 151. The first paragraph of that section provides: ''The board of supervisors shall have power and it shall be its duty to fix by ordinance from time to time, as in this section provided, all salaries, wages, and compensations of every kind and nature, except pension or retirement allowances, for the positions, or places of employment, of all officers and employees of all departments, offices, boards and commissions of the city and county in all cases where such compensations are paid by the city and county.''

The next paragraph of the section sets forth certain exclusions, and then the charter continues by setting forth in detail how the ''ordinance'' referred to in the first paragraph shall be prepared and passed. Thus it is provided that: ''In fixing schedules of compensation as in this section provided, the civil service commission shall prepare and submit to the board of supervisors and the board shall adopt a schedule of compensations which shall include all classifications, posi-

tions and places of employment . . . subject to the provisions of this section; . . .'' The section then permits the commission to propose and the board to adopt amendments to the schedule necessary to cover any new classifications. The paragraph then continues: ''Under the schedules of compensation recommended by the civil service commission and adopted by the board of supervisors as herein provided, like compensation shall be paid for like service, . . . and . . . the proposed schedules of compensation shall provide for minima, inter· mediate, and maxima salaries. . . . The compensations fixed as herein provided shall be in accord with the generally prevailing rates of wages for like service and working conditions in private employment or in other comparable governmental organizations in this state; provided, that for specialized services which are peculiar to the municipal service and not duplicated elsewhere in private or other governmental organizations in this state, the commission shall recommend and the board of supervisors shall fix a compensation which shall be in accord with the wages paid in private employment or other governmental organizations in the state for the nearest comparable service and working conditions; and provided further that if the civil service commission determines on the basis of facts and data collected as hereinafter provided that the rates generally prevailing for a particular service in private employment or in other governmental organizations are inconsistent with the rates generally prevailing in private employment or other governmental organizations for services requiring generally comparable training and experience, the commission shall set forth these data in its official records and shall recommend and the board of supervisors shall fix a compensation for such service that shall be consistent with the compenations fixed by the board of supervisors for other services requiring generally comparable training and experience; . . .''

The next paragraph describes, in some detail, the duties and functions of the civil service commission. It reads, in part, as follows: ''The proposed schedules of compensation or any amendments thereto shall be recommended by the civil service commission solely on the basis of facts and data obtained in a comprehensive investigation and survey concerning wages paid in private employment for like service and working conditions or in other governmental organizations in this state. The commission shall set forth in the official records of its proceedings all of the data thus obtained

and on the basis of such data the commission shall set forth in its official records an order making its findings as to what is the generally prevailing rate of pay for each class of employment in the municipal service as herein provided, and shall recommend a rate of pay for each such classification in accordance therewith. The proposed schedules of compensation recommended by the civil service commission shall be transmitted to the board of supervisors, together with a compilation of a summary of the data obtained and considered by the civil service commission and a comparison showing existing schedules. . . ."

The balance of the paragraph requires that existing schedules and the proposed new schedules shall be published for two weeks before being submitted to the board of supervisors. The next paragraph defines the duties of the board. It provides as follows: "The board of supervisors may approve, amend or reject the schedule of compensations proposed by the civil service commission; provided, that before making any amendment thereto the data considered by the board of supervisors as warranting such amendment shall be transmitted to the civil service commission for review and analysis and the commission shall make a report thereon to the board of supervisors, together with a report as to what other changes, and the cost thereof such proposed amendment would require to maintain an equitable relationship with other rates in such schedule."

The next paragraph starts off with a provision not here relevant referring to the salaries of incumbents, and then concludes as follows: "The salaries and wages paid to employees whose compensations are subject to the provisions of this section shall be those fixed in the schedule of compensations adopted by the board of supervisors as herein provided and in accord with the provisions of the ordinance of the board of supervisors adopting the said schedule, and the compensations set forth in the budget estimates, and the annual salary ordinance and appropriations therefor shall be in accord therewith."

The next paragraph reads, in part, as follows: "Not later than January 15th, 1944, and every five years thereafter and more often if in the judgment of the civil service commission or the board of supervisors economic conditions have changed to the extent that revision of existing schedules may be warranted in order to reflect current prevailing conditions, the civil service commission shall prepare and submit to the board of

supervisors a schedule of compensations as in this section provided. A schedule of compensations or amendments thereto as provided herein which is adopted by the board of supervisors on or before April 1st of any year shall become effective at the beginning of the next succeeding fiscal year and a schedule of compensations or amendments thereto adopted by the board of supervisors after April 1st of any year shall not become effective until the beginning of the second succeeding fiscal year. . . ."

The major contention of the appellant is that the fixing of salaries by the board of supervisors as set forth in section 151 is an administrative act and not a legislative one, and so cannot be made the subject of a referendum. Much is said in the briefs as to whether a city, by charter provision, may expand the extent of the referendum power beyond that granted in the Constitution, or is limited thereby—in other words, whether the Constitution is a minimum or a maximum grant of power.* We do not find it necessary to decide this question, because under the state Constitution and the charter of San Francisco, as already quoted, the right of referendum is limited to legislative acts and excludes administrative, executive or judicial acts. ▮ The initiative and referendum are two forms of legislative power reserved to the people. Since they deal with the reserved powers of the people, they should be liberally construed to uphold the power wherever that can reasonably be done. (*Warner* v. *Kenny*, 27 Cal.2d 627 [165 P.2d 889].) The courts are reluctant, and properly so, to interfere with the legislative process. (*Santa Clara County* v. *Superior Court*, 33 Cal.2d 552 [203 P.2d 1].)

▮ The key question presented is whether the board of supervisors, in passing a salary standardization ordinance, acts administratively or legislatively. The appellant argues that under section 151 the charter fixes the policy, the civil service commission finds the facts, and the board merely follows the mandate of the charter and the recommendations

---

. *For cases holding or implying that the state Constitution limits the referendum powers of charter cities, see *McKevitt* v. *City of Sacramento*, 55 Cal.App. 117 [203 P. 132]; *Dye* v. *Council of the City of Compton*, 80 Cal.App.2d 486 [182 P.2d 623]; *Chase* v. *Kalber*, 28 Cal. App. 561 [153 P. 397]; *Kleiber* v. *City etc. of San Francisco*, 18 Cal.2d 718 [177 P.2d 657]; *Brown* v. *Boyd*, 33 Cal.App.2d 416 [91 P.2d 926]. For cases holding or implying that chartered cities may make a broader use of referendum powers than the limits set forth in the Constitution, see *Hopping* v. *Council of City of Richmond*, 170 Cal. 605 [150 P. 977]; *Dwyer* v. *City Council of Berkeley*, 200 Cal. 505 [253 P. 932].

of the commission. Therefore, so it is argued, the board acts merely in an administrative capacity. This contention was disposed of by the trial judge, the Honorable Thomas P. O'Donnell, in a well-reasoned opinion which adequately disposes of this issue. It was there said, in part:

"It is plaintiff's theory that section 151 declares a public purpose and fixes the standards by which such purpose is to be effectuated, and that therefore the board acted merely as an administrative vehicle in bringing this purpose to fruition through the adoption of Ordinance 5955.

"It is settled in this state that ordinarily the fixing of salaries of municipal employees is a legislative act. (*Spencer* v. *City of Alhambra,* 44 Cal.App.2d 75 [111 P.2d 910]; *City and County of San Francisco* v. *Boyd,* 22 Cal.2d 685 [140 P.2d 666].) Plaintiff would remove the instant case from the operation of that rule on the ground that section 151 provides a complete method for fixing salaries, leaving nothing for the board to do other than put the provisions of that section into effect.

"The following clause of section 151 would seem to provide the answer to that contention. It reads: 'The board of supervisors may approve, amend or reject the schedule of compensations proposed by the civil service commission.' The obvious effect of the clause just quoted is (1) that the commission acts in an advisory capacity only, and (2) that the board's authority is (within the bounds of reasonableness) plenary. As said by our Supreme Court in commenting on this selfsame provision: 'Thus it is clear that the rates of compensation are fixed by the board of supervisors and involve an exercise of the independent judgment of that body.' (Boyd case, *supra,* p. 692.)

"Other provisions of section 151 are inferentially corroborative of this conclusion. For instance, the section provides that salaries shall be fixed 'by ordinance.' If the fixing of salaries was intended to be an administrative process only, why would not a simple resolution of the board suffice? The answer would seem to be that the people desired to reserve the right of review of the board's action by referendum.

"Again, if the people in adopting section 151 had intended that the fixing of salaries thereunder was to be but a perfunctory administrative process, is it not reasonable to believe that the execution of the provisions of that section would have been vested in an administrative body—the civil service com-

mission, for instance—rather than in a body whose functions are primarily legislative?

"Turning to charter section 179 which enumerates the acts of the board that are exempt from referendum, we find that it includes those that deal with 'purely administrative matters.' The word 'purely' must be deemed to have been used advisedly. Conceding for the purpose of discussion that Ordinance 5955 does, in view of the provisions of section 151, have certain administrative aspects, can it fairly be said that it is 'purely' administrative? Is not Ordinance 5955 at least partially legislative in character in that it makes new law, and in the making thereof 'involves an exercise of the independent judgment of that body'? (Boyd case, *supra.*)"

We agree with this reasonong. Under section 151 the board exercises some legislative discretion as to the standardization process. Since the board has the power to reject the schedules submitted by the commission and to amend them, although it must then await additional data from the commission, it is obvious that the board exercises considerable discretion in the process. The factual determination of such difficult questions as "prevailing rates" and "comparable service and working conditions," and "comparable training and experience," and what constitutes "consistent" compensation, clearly involves a discretionary fact finding process, and is therefore legislative in character. (*City and County of San Francisco* v. *Boyd,* 22 Cal.2d 685 [140 P.2d 666].)

It will be noted that section 179 excludes from the referendum process "Annual budget and appropriation ordinances, supplemental appropriation ordinances, the annual salary ordinance, or ordinances amending the same." Appellant urges that these exclusions, by necessary implication, include the salary standardization ordinance because salary standardization is an integral part of the budgetary process. The argument is untenable. The salary standardization ordinance is not included by name in the exclusions, and we cannot include it under the guise of interpretation. As already pointed out, referendum statutes must be liberally construed in favor of this reserve power. Exclusions must be strictly construed. Under the familiar maxim of *expressio unius est exclusio alterius* it is well settled that, when a statute expresses certain exceptions to a general rule, other exceptions are necessarily excluded. (See cases collected 23 Cal.Jur. p. 740, § 118.) The annual salary ordinance, the

annual budget and the appropriation ordinances are a separate process from the standardization ordinance and the charter so provides.

It is no answer to argue, as does appellant, that the exclusions in section 179 were adopted in 1935, while the salary standardization procedure was not adopted until 1943. Of course, if the people had desired in 1943 to exclude the salary standardization ordinance from the referendum they could, would and should have amended section 179 to so provide.

The judgment appealed from is affirmed.

Bray, J., and Wood (Fred B.), J., concurred.