[No. S034268. Nov. 23, 1994.]

VOTERS FOR RESPONSIBLE RETIREMENT, Plaintiff and Appellant, v. BOARD OF SUPERVISORS OF TRINITY COUNTY et al., Defendants and Respondents.

**COUNSEL**

Alfred S. Wilkins for Plaintiff and Appellant.

John W. Anderson, County Counsel, David L. Cross, District Attorney, and W. James Wood, Deputy District Attorney, for Defendants and Respondents.

Lita O'Neill Blatner, County Counsel (Tulare), Kathleen Bales-Lange, Deputy County Counsel, Steven M. Woodside, County Counsel (Santa Clara), James Rumble, Deputy County Counsel, Lloyd M. Harmon, Jr., County Counsel (San Diego), John Sansone, Deputy County Counsel, Dwight L. Herr, County Counsel (Santa Cruz), Margie Valdez, William Corman and David L. Edwards as Amici Curiae on behalf of Defendants and Respondents.

**OPINION**

**MOSK, J.**—In this case we are called upon to decide whether a county's decision to enter into an agreement with the California Public Employees' Retirement System (PERS), to enable its employees to join PERS's retirement plan, is subject to approval or rejection by the local electorate via referendum. Respondent Trinity County (the County) advances several constitutional and statutory arguments designed to establish that decisions of a county board of supervisors regarding employee compensation generally, and decisions regarding the adoption or implementation of memoranda of understanding (sometimes referred to hereafter as MOU's) between public employers and employees in particular, are not subject to referendum. Appellant Voters for Responsible Retirement (VFRR) contends, on the contrary, that a referendum is in this instance constitutionally compelled.

We conclude that article XI, section 1, subdivision (b), of the California Constitution, contrary to contentions of both parties, neither restricts nor secures the local right of referendum on employee compensation decisions. We also conclude that Government Code section 25123, subdivision (e), when read in conjunction with the Meyers-Milias-Brown Act, does restrict the people's right of referendum in this case, in which the ordinance that would be the subject of referendum specifically relates to the implementation of a memorandum of understanding between the County and its employee associations.

## I. *Facts*

On November 5, 1991, the Trinity County Board of Supervisors (the Board) approved a three-year memorandum of understanding with the Trinity County Employees' Association, representing most of the County's clerical, professional and service employees, and an MOU with the Trinity County Road Employees' Association, skilled trades unit, representing various county employees in maintenance, engineering and related fields (hereafter referred to collectively as the Employee Associations). Section 8.00.00 of both MOU's provided that, effective July 1, 1992, the County would implement the PERS "2 percent at 60" retirement program (wherein an employee could retire at age 60 with an annuity of 2 percent of his or her salary for every year of employment) for all members of the Employee Associations. Provisions were made to return employee contributions from the previous retirement plan. Section 8.02.00 further provided that the County would pay the employee's contribution to PERS. Section 8.03.00 imposes certain conditions on the final approval of the amended PERS contract implementing the new retirement plan, which will be discussed at greater length in part III.C. of this opinion.

The approval of these MOU's was done in conjunction with the negotiation of an amendment to the County's contract with PERS. The previous contract had included only members and employees of the deputy sheriffs' association. The amendment would place the employees from the Employee Associations in PERS, under the terms of the 2 percent at 60 plan in a manner consistent with the provisions of the MOU's stated above. On November 19, 1991, pursuant to Government Code section 20457, the Board adopted Resolution No. 153-91, declaring its intent to approve an amendment to the PERS contract. On December 17, 1991, pursuant to Government Code sections 20460 and 20461,[1] the Board approved the contract amendment through the passage of Ordinance No. 1161.

Concern over the new financial commitment the County was assuming in funding the pension plan sparked opposition. In a December 27, 1991, letter to a citizen of the County, the County Administrative Officer noted that there was substantial community concern that the new retirement plan created a burden the County would be unable to bear without cutting back on essential services, including the "closure of the County Hospital." The County Administrative Officer gave assurance that no such service cutbacks would occur, and that implementation of the PERS plan was necessary for maintaining a stable and high quality County workforce.

---

[1] All statutory references are to the Government Code, unless otherwise indicated.

Despite these assurances, citizens of the County collected and timely filed with the County Clerk petitions with signatures calling for a referendum on Ordinance No. 1161. On January 29, 1992, the clerk presented the petitions to the Board and certified that sufficient signatures had been obtained to require the Board to either repeal the ordinance or put it up for a referendum vote pursuant to Elections Code sections 3753 and 3754. On the advice of County Counsel, the Board refused to do either. A group of Trinity County citizens calling itself the Voters for Responsible Retirement thereupon filed a petition for a writ of mandate in the superior court to compel the Board to put the ordinance to referendum. The County argued that, for various reasons, Ordinance No. 1161 was not the type of ordinance subject to referendum, and the trial court agreed, denying the writ.

The Court of Appeal reversed. It found that article XI, section 1, subdivision (b) of the California Constitution dictated that issues of employee compensation be subject to referendum. Moreover, it rejected contentions that there were valid statutory exemptions from the referendum requirement applicable to Ordinance No. 1161. We granted the County's petition for review to consider the important question of the applicability of referenda to county employer-employee agreements.

## II. *Article XI, Section 1, Subdivision (b)*

Both the County and VFRR contend that the answer to the question whether a referendum should be permitted in this case lies in the proper understanding of article XI, section 1, subdivision (b) of the California Constitution (article XI, section 1(b)). As shall be seen, that constitutional provision supports neither side's contention.

Article XI, section 1(b) states in full: "The Legislature shall provide for county powers, an elected county sheriff, an elected district attorney, an elected assessor, and an elected governing body in each county. Except as provided in subdivision (b) of Section 4 of this article, each governing body shall prescribe by ordinance the compensation of its members, but the ordinance prescribing such compensation *shall be subject to referendum.* The Legislature or the governing body may provide for other officers whose compensation shall be prescribed by the governing body. *The governing body shall provide for the number, compensation, tenure, and appointment of employees.*" (Italics added.)

The County and its amici curiae argue that the specific mention of the referendum power in connection with the compensation of members of the governing body implies that other employee compensation decisions are not

subject to referendum. In support of this position, amici curiae for the County produce the ballot argument by the proponents of the November 1970 amendment to article XI, section 1(b), in which reference to referendum for the governing body's compensation first appeared. As will appear, we find these arguments unpersuasive.

In interpreting the meaning of a constitutional amendment, we seek to give effect to the intention of the electorate enacting it by looking at the language of the amendment and by examining the ballot argument and other indicia of voter intent. (*Hill* v. *National Collegiate Athletic Assn.* (1994) 7 Cal.4th 1, 16 [26 Cal.Rptr.2d 834, 865 P.2d 633].) In this case, the language of article XI, section 1(b) is admittedly ambiguous—neither explicitly affirming nor negating the right to referendum regarding the compensation of employees other than the members of the boards of supervisors. We concede that section 1(b) is susceptible to the County's interpretation. However, once the amendment is understood in its proper context, such an interpretation is implausible.

Article XI, section 1(b) was originally enacted in June of 1970, as part of a comprehensive revision of article XI, governing the constitutional prerogatives of and limitations on California cities and counties. The predecessor to article XI, section 1(b) was former article XI, section 5, which, as explained further below, was amended in 1933, and subsequently, to give greater local autonomy to the setting of salaries for county officers and employees, removing that function from the centralized control of the Legislature. Nonetheless, the June 1970 enactment still mandated the Legislature to set the salary of the boards of supervisors, which were in turn to set the salaries of all other officers and employees. In November of 1970, in an action of the Legislature, the amendment to article XI, section 1(b) was placed on the ballot to provide that the supervisors should set their own salaries, subject to referendum, and it was approved.

Amici curiae for the County maintain that, if the June 1970 version of article XI, section 1(b) already had subjected decisions on employee compensation to referendum, the Legislature would not have needed to include the explicit language on referendum for the boards of supervisors' compensation in its November 1970 amendment of article XI, section 1(b); they argue, in other words, that to interpret the provision otherwise would be to say that the Legislature added meaningless surplusage in the November 1970 amendment of article XI, section 1(b). We disagree.

■ Although a statute or constitutional provision should be interpreted so as to eliminate surplusage, there is no rule of construction requiring us to

assume that the Legislature has used the most economical means of expression in drafting a statute or constitutional amendment. **(1b)** In this case, it is understandable that, even if the legislative drafters of the November 1970 amendment understood there to be a general right to referendum with regard to county employee compensation under article II, section 11 of the California Constitution (see pt. III, *post*), they would wish to emphasize in the amendment that the supervisors' salaries were subject to referendum. After all, the amendment was taking the matter of the supervisors' salaries out of the hands of the Legislature and placing it in the province of the supervisors themselves. It takes no substantial imagination to comprehend how the legislative drafters would want to make clear to the electorate that the proposed amendment contained built-in safeguards to ensure against the supervisors' self-aggrandizement. This they did by making explicit that the supervisors' decisions setting their own salary could be revoked by referendum. If, on the other hand, the legislative framers of the November 1970 amendment had no opinion, or were uncertain, as to whether the referendum was available for general employee compensation decisions, then the need to emphasize that supervisors' salaries were subject to referendum becomes all the more comprehensible.

Moreover, the reference to referendum for supervisors' salaries is not surplusage for an additional reason: Even if the framers and adopters of the amended article XI had assumed that the setting of county employee salaries other than those of supervisors was subject to the general right of referendum under article II, section 11 of the California Constitution, they might still wish, through article XI, section 1(b), to give the referendum over supervisors' salaries an independent constitutional basis. As explained in part III of this opinion, *post*, the Legislature may, under some circumstances, restrict by statute the local power of referendum derived from article II, section 11. Article XI, section 1(b), makes clear that the right of the county electorate to vote on supervisors' salaries is guaranteed by an explicit constitutional provision, and may not be statutorily modified.

Amici curiae for the County place their reliance on the language of the ballot argument accompanying Proposition 12 on the November 1970 ballot. Arguing in favor of Proposition 12, Senators Milton Marks and John McCarthy, and Assemblyman John Knox, stated as follows: "Such 'salary setting' would be done at the local level after public hearings in your own county, and would be subject to a vote in your community if taxpayers believe that the salaries are too high, *which is a right you do not now have*." (Ballot Pamp., Proposed Amends. to Cal. Const. with arguments to voters, Gen. Elec. (Nov. 3, 1970) [hereafter Ballot Argument] pp. 20-21, italics

added.) Amici curiae argue that this latter phrase demonstrates that the ballot proponents assumed that article XI, section 1(b) gave the electorate no power to vote on employee compensation via referendum, and that the November 1970 amendment was needed to give the electorate that power over the boards of supervisors' decisions on their own salaries.

It is true that the local electorate did not have a right to referendum over supervisors' salaries prior to November 1970, since that power was in the hands of the Legislature. There is no reason to believe the proponents of Proposition 12 meant any more than this when they stated that the right to referendum on *supervisors'* salaries is a "right you do not now have." The most credible inference from the language of the amendment and the ballot argument is that neither the legislative drafters nor the electorate gave any consideration whatsoever to the issue of whether the county voters had referendum powers over the setting of salaries of county employees other than supervisors.

Moreover, the thrust of the ballot argument in favor of Proposition 12 was that it would "restore home rule on salaries." (Ballot Argument, *supra*, at p. 20.) It is likely that the electorate would have been surprised to learn that a measure designed to promote home rule was one which, by an interpretive slight of hand, constitutionally enshrined the county electorate's lack of referendum power over employee compensation decisions.

The VFRR argues, on the other hand, and the Court of Appeal found below, that article XI, section 1(b), when viewed in the proper historical context, does indeed provide for the power of the county electorate to vote on public employee compensation ordinances by means of referendum. This argument starts with the constitutional provision that preceded article XI, section 1(b), the former article XI, section 5, as amended in 1933. The 1933 amendment transferred control over the compensation of most county employees and officers from the Legislature to the boards of supervisors. That same amendment validated a "certain act entitled 'An act to add a new section to the Political Code to be numbered 4056d . . . .' " Former Political Code section 4056d, as enacted in 1933, provided that laws then in effect regulating compensation of county officers and employees, which had previously been enacted as state statutes, "are hereby continued in force and effect solely as ordinances of the respective counties to which they relate, and may be superseded, modified or otherwise affected by ordinances hereafter adopted in the respective counties and *subject to the rights of initiative, referendum and recall as reserved to the electors of such counties.*" (Stats. 1933, ch. 643, § 1, p. 1674, italics added.)

The intent on the part of the Legislature in the 1933 amendments to make the supervisors' salary-setting decisions subject to referendum is made even more clear, VFRR argues, by the 1933 ballot argument in favor of Proposition 8, which states in part: "The act which is validated by this constitutional amendment carries out its purposes, and provides that present State laws fixing salaries shall be effective solely as local ordinances, and may be superseded by ordinance hereafter adopted, subject to the regular initiative and referendum powers of the people." (Ballot Pamp., Proposed Amends. to Cal. Const. with arguments to voters, Special Statewide Elec. (June 27, 1933) p. 11.)

Although the 1933 amendment to article XI, section 5 may have subjected employee compensation decisions to referendum, that same intent cannot be imputed to either the drafters or the adopters of the current article XI, section 1(b). Nothing in either the language or the ballot argument of the June enactment or November 1970 amendment of article XI, section 1(b) bears any sign of considering the question whether regular employee compensation is to be subject to referendum. What *is* clear is that the voters who approved the June 1970 amendment knew that they were *expressly repealing* the former article XI, including former section 5. (See Ballot Pamp., Proposed Amends. to Cal. Const. with arguments to voters, Primary Elec. (June 2, 1970) p. 2 [Prop. 2, declaring former article XI repealed].) Arguments about the meaning of that former article are therefore of limited value.

The Court of Appeal made much of article XI, section 13, which states in part that "the provisions of Section 1(b) (except for the second sentence), 3(a), 4, and 5 of this Article relating to matters affecting the distribution of powers between the Legislature and cities and counties . . . shall be construed as a restatement of all related provisions of the Constitution in effect immediately prior to the effective date of this amendment, and as making no substantive change." The Court of Appeal infers from this provision an intent to carry on into the new article XI, section 1(b) the referendum provisions implied in the 1933 amendments to former article XI, section 5.

Yet the attempt to use article XI, section 13 to strengthen the tenuous connection between the 1933 amendment of article XI, section 5, and the current article XI, section 1(b), fails for two reasons. First, the current article XI, section 13 specifies that "matters affecting the *distribution of powers between the Legislature and the cities and counties* . . . shall be construed as a restatement of" previous constitutions provisions. But the restriction of the local right of referendum does not affect the distribution of power between the counties and the Legislature; rather, it concerns the apportionment of

local legislative power between the boards of supervisors and the county electorate. (See *Committee of Seven Thousand* v. *Superior Court* (1988) 45 Cal.3d 491, 511-512 [247 Cal.Rptr. 362, 754 P.2d 708] [state legislative power to preempt local legislation is co-extensive with power to preempt local initiative and referendum].) Article XI, section 13 cannot therefore be read as preserving the referendum provisions of former article XI, section 5.

Second, article XI, section 13 incorporates relevant constitutional provisions that existed "immediately prior to" the adoption of the new article XI. The reference to the former Political Code section 4056d (which contained the referendum provision) found in the 1933 amendments was deleted when the former article XI, section 5 was amended in 1962. Therefore, former article XI, section 5, as it existed "immediately prior" to the enactment of the new article XI, contained not even an oblique reference to the local referendum power with respect to employee compensation. It thus cannot be inferred that either the framers or adopters of article XI, section 1(b) were aware that the former article XI contained referendum procedures for employee compensation decisions, much less that they manifested any intent to carry those referendum procedures over into the new article XI.

In sum, article XI, section 1(b), by itself, neither guarantees nor restricts the right to review, by voter referendum, a board of supervisors' decisions regarding compensation of county employees.

### III. *Statutory Exemptions From the Right of Referendum*

#### A. *The Effect of Section 25123, Subdivision (e)*

█ The County contends that section 25123, subdivision (e), precludes the present ordinance from being subject to referendum. The subdivision provides that county ordinances which specifically relate "to the adoption or implementation of a memorandum of understanding with an employee organization" shall go into effect immediately, excepting them from the general rule that ordinances are to go into effect 30 days after the date of final passage. (*Ibid.*) We agree with the County's position.

The right of voters of cities and counties to referendum derives from article II, section 11. That section provides in part that "[i]nitiative and referendum powers may be exercised by the electors of each city or county under procedures that the Legislature shall provide." (*Ibid.*) █ " '[I]t has long been our judicial policy to apply a liberal construction to this power whenever it is challenged in order that the right be not improperly annulled. If doubts can reasonably be resolved in favor of the use of this reserve

power, courts will preserve it.' " (*Associated Home Builders etc., Inc.* v. *City of Livermore* (1976) 18 Cal.3d 582, 591 [135 Cal.Rptr. 41, 557 P.2d 473, 92 A.L.R.3d 1038].) ▮ Thus, we will presume, absent a clear showing of the Legislature's intent to the contrary, that legislative decisions of a city council or board of supervisors—including local employee compensation decisions (see *Collins* v. *City & County of S.F.* (1952) 112 Cal.App.2d 719, 730 [247 P.2d 362])—are subject to initiative and referendum. In this case, the legislative intent to bar the referendum power over the ordinance in question is unmistakable. To understand why this is so, a brief review of the statutes governing the conduct of a county referendum is appropriate.

The legislative procedures authorized by article II, section 11 for county referenda are set forth in Elections Code section 3750 et seq. Elections Code section 3751, subdivision (b) provides that all county ordinances, with certain enumerated exceptions, "shall become effective 30 days from and after the date of final passage" by the board of supervisors. Elections Code section 3753 provides that between the date of the adoption of the ordinance and the date the ordinance becomes finally effective 30 days later, a petition "by voters of the county equal in number to at least 10 percent of the entire vote cast within the county for all candidates for Governor at the last gubernatorial election," will suspend the ordinance and compel the board of supervisors to reconsider it. Elections Code section 3754 provides that if the board of supervisors fails to "entirely repeal" the ordinance, it shall be submitted to a countywide referendum.

Elections Code section 3751 excepts certain types of county ordinances from the 30-day effective date rule, providing instead that these ordinances go into effect immediately. Of greatest relevance to the present case is Elections Code section 3751, subdivision (a)(2), which excepts from the 30-day rule ordinances "specifically required by law to take immediate effect." Thus, Elections Code section 3751, read in conjunction with Elections Code sections 3753 and 3754, makes clear that when the Legislature desired to denominate certain types of ordinances that were not subject to county referendum procedures, it did so not by specifically declaring these ordinances ineligible for referendum, but rather by providing that they go into effect immediately. (See *Midway Orchards* v. *County of Butte* (1990) 220 Cal.App.3d 765, 773-774 [269 Cal.Rptr. 796].)

Government Code section 25123 in turn parallels Elections Code section 3751 et seq. in that it provides all county ordinances shall become effective 30 days from final passage, except for certain classes of ordinances which are to go into effect immediately. Subdivision (e) of section 25123, quoted

above, is one such class. Thus, ordinances specifically related to the adoption or implementation of memoranda of understanding with employee organizations are one class of ordinances "specifically required by law to take effect immediately" under Elections Code section 3751, subdivision (a)(2), and are therefore exempt from the referendum procedures provided in Elections Code sections 3753 and 3754.

VFRR does not attempt to challenge this construction of section 25123, subdivision (e), nor does it dispute for the most part[2] that the subdivision applies to the ordinance in question. Rather VFRR insists, as the Court of Appeal below held, that section 25123, subdivision (e), in effect, unconstitutionally deprives county voters of the right to repeal such ordinances by referendum. It is to this contention that we now turn.

B. *The Constitutionality of Section 25123, Subdivision (e)*

1. *Article II, Section 11 and Section 25123, Subdivision (e)*

In order to consider the merits of VFRR's constitutional contention, we first review the constitutional sources of authority both of the people's right to referendum, and the Legislature's prerogative to restrict that right. Article II, section 9 of the California Constitution is the source of the state electorate's power to exercise the referendum. Subdivision (a) of that section provides: "The referendum is the power of the electors to approve or reject statutes or parts of statutes except urgency statutes, statutes calling elections, and statutes providing for tax levies or appropriations for usual current expenses of the State." (Cal. Const., art. II, § 9, subd. (a).) We have interpreted article II, section 11, which, as noted above, is the source for the initiative and referendum power of city and county electors, to incorporate the same exceptions to the referendum power as are set forth in article II, section 9. (*Geiger* v. *Board of Supervisors* (1957) 48 Cal.2d 832, 836 [313 P.2d 545].)

Section 25123, subdivisions (a), (c), and (d) in turn incorporate the constitutional exceptions to the referendum power found in article II, section 9, providing that county ordinances relating to elections and taxation, and urgency ordinances, respectively, are to go into effect immediately—and, as discussed above, are therefore not subject to referendum. Section 25123, subdivision (b) provides an unspecified catch-all exception to the 30-day effective date rule for ordinances required by law to take effect immediately.

---

[2]Part III. C. of this opinion, *post*, provides a more complete discussion of the applicability of section 25123, subdivision (e), to Ordinance No. 1161.

But in subdivision (e) the Legislature has apparently created a new category of exemptions to the local referendum power—one not found in the Constitution—for ordinances approving and implementing MOU's. VFRR contends that, in doing so, the Legislature has exceeded its constitutional authority.

In evaluating this contention, we first observe that the Legislature's power to restrict *local* referendum derives not only from the exceptions found implicitly in article II, section 11, but also from its power to enact general laws of statewide importance that override local legislation. ▮ "In matters of statewide concern, the state may if it chooses preempt the entire field to the exclusion of all local control. If the state chooses instead to grant some measure of local control and autonomy, it has authority to impose procedural restrictions on the exercise of the power granted, including the authority to bar the exercise of the initiative and referendum." (*Committee of Seven Thousand* v. *Superior Court, supra*, 45 Cal.3d 491, 511 [hereafter *COST*].) Although, as this court explained in *COST*, the courts of this state have sometimes resorted to the distinction between local "legislative" acts that are subject to initiative and referendum and "administrative" acts of the local governing body that are not, such a distinction does not capture the full extent of the state's authority to restrict the local initiative and referendum power. "The state's plenary power over matters of statewide concern is sufficient authorization for legislation barring local exercise of initiative and referendum as to matters which have been specifically and exclusively delegated to a local legislative body." (*Id.* at pp. 511-512.)

Thus, the Legislature may restrict the right of referendum if this is done as part of the exercise of its plenary power to legislate in matters of statewide concern. ▮ In the present case, section 25123, subdivision (e), on its face, does not appear to be embedded in any statutory scheme from which a statewide purpose can be inferred.[3] Moreover, section 25123, subdivision (e) involves agreements regarding matters of local employee compensation and

---

[3]We note that what legislative history is available does not readily disclose what statewide purpose the Legislature intended to advance by restricting the referendum power in section 25123, subdivision (e). The staff analysis by the Senate Committee on Governmental Organization declares that the statute was intended to spare county employees from having to wait 30 days before they received the benefit of salary increases contained in new MOU's. (Sen. Com. on Governmental Organization, Analysis of Sen. Bill No. 182 (1981-1982 Reg. Sess.) at pp. 1-2.) But the Legislature is presumed to be aware of all laws existent at the time it passes a statute (see, e.g., *Bailey* v. *Superior Court* (1977) 19 Cal.3d 970, 977, fn. 10 [140 Cal.Rptr. 669, 568 P.2d 394]). It therefore follows that the Legislature must be presumed to have either intended to restrict the referendum power with section 25123, subdivision (e), or assumed that the referendum power with regard to ordinances adopting or implementing employer-employee MOU's was already restricted. (See pt. III. B. 2., *post.*)

other conditions of employment—generally a matter of local rather than statewide concern. (See *Sonoma County Organization of Public Employees v. County of Sonoma* (1979) 23 Cal.3d 296, 317 [152 Cal.Rptr. 903, 591 P.2d 1].) How, then, can section 25123, subdivision (e) be constitutionally justified?

■ In answering that question, we are mindful that " '[A]ll presumptions and intendments favor the validity of a statute and mere doubt does not afford sufficient reason for a judicial declaration of invalidity. Statutes must be upheld unless their unconstitutionality clearly, positively, and unmistakably appears.' " (*Calfarm Ins. Co. v. Deukmejian* (1989) 48 Cal.3d 805, 814 [258 Cal.Rptr. 161, 771 P.2d 1247].) ■ In this case we will uphold section 25123, subdivision (e)'s constitutionality if its referendum restriction—considered together with statutes of related subject matter—advances legislative goals that are a matter of statewide concern. (*COST, supra,* 45 Cal.3d at pp. 511-512.) In other words, we will uphold section 25123, subdivision (e) if we can infer that the subdivision's implied delegation of exclusive decisionmaking authority to the boards of supervisors to adopt and implement memoranda of understanding between counties and their employee associations fulfills some legislative purpose of statewide import. Because section 25123, subdivision (e) concerns the approval of memoranda of understanding between public employers and employees, we naturally turn to an examination of the Meyers-Milias-Brown Act (MMBA) (§ 3500 et seq.), the legislation governing the collective bargaining process between local government agencies and employee organizations from which these memoranda of understanding emerge. As will appear below, we find that the MMBA embodies a statutory scheme in an area of statewide concern that justifies the referendum restriction inherent in section 25123, subdivision (e).

### 2. *The Meyers-Milias-Brown Act*

The MMBA is intended "to promote full communication between public employers and their employees by providing a reasonable method of resolving disputes regarding wages, hours, and other terms and conditions of employment between public employers and public employee organizations." (§ 3500.) The centerpiece of the MMBA is section 3505, which requires the *governing body* of a local public agency, or its designated representative, to "meet and confer in good faith regarding wages, hours, and other terms and conditions of employment with representatives of such recognized employee organizations." As we recounted in the *Glendale City Employees' Assn., Inc. v. City of Glendale* (1975) 15 Cal.3d 328, 335 [124 Cal.Rptr. 513, 540 P.2d

609]), the MMBA represented an evolution from the earlier George Brown Act, which "provided only that management representatives should listen to and discuss the demands of the unions." In its present form, the MMBA mandates that the governing body undertake negotiations with employee representatives not merely to listen to their grievances, but also "with the objective of reaching 'agreement on matters within the scope of representation prior to the adoption by the public agency of its final budget for the ensuing year.' " (*Id.* at p. 336, quoting § 3505, italics omitted.)

The culmination of this meet and confer process is set forth in section 3505.1: "If agreement is reached by the representatives of the public agency and a recognized employee organization or recognized employee organizations, they shall jointly prepare a written memorandum of such understanding, which shall not be binding, and present it to the governing body or its statutory representative for determination." Once the governing body approves the memorandum of understanding, it then becomes binding on both parties. (*Glendale City Employees' Assn., Inc.* v. *City of Glendale, supra,* 15 Cal.3d at p. 336.)

It is indisputable that the procedures set forth in the MMBA are a matter of statewide concern, and are preemptive of contradictory local labor-management procedures. (*International Brotherhood of Electrical Workers* v. *City of Gridley* (1983) 34 Cal.3d 191, 202 [193 Cal.Rptr. 518, 666 P.2d 960].) As we further clarified in *People* ex rel. *Seal Beach Police Officers Assn.* v. *City of Seal Beach* (1984) 36 Cal.3d 591, 600-601, footnote 11 [205 Cal.Rptr. 794, 685 P.2d 1145], "there is a clear distinction between the *substance* of a public employee labor issue and the *procedure* by which it is resolved. Thus there is no question that 'salaries of local employees of a charter city constitute municipal affairs and are not subject to general laws.' [Citation.] Nevertheless, the process by which salaries are fixed is obviously a matter of statewide concern . . . ."

We have had no occasion to consider how a referendum might fit into the collective bargaining regime contemplated by the MMBA. The one court to do so held that a charter provision requiring that all increases in employee benefits be subject to voter approval was compatible with the MMBA. (*United Public Employees* v. *City and County of San Francisco* (1987) 190 Cal.App.3d 419, 426 [235 Cal.Rptr. 477] [hereafter *United Public Employees*].) The court rejected the argument that voter approval requirements could render the negotiating process mandated by the MMBA meaningless and unproductive. The court reasoned that since "the purpose of the MMBA is to 'promote full communication between public employers and their

employees' " (190 Cal.App.3d at p. 425, quoting § 3500), the purposes of the statute is served even though the governing body participating in the meet and confer process does not have the final authority to approve the agreement resulting from that process. (*United Public Employees, supra,* 190 Cal.App.3d at pp. 425-426.)

While we do not determine whether the result in *United Public Employees* was correct,[4] we observe that the decision understated the problematic nature of the relationship between the MMBA and the local referendum power. As we have noted, the purpose of the MMBA is more than promoting communication between employees and employers. Its aim is also to resolve "disputes regarding wages, hours, and other terms and conditions of employment between public employers and public employee organizations" (§ 3500) through the negotiation of binding agreements. If the bargaining process and ultimate ratification of the fruits of this dispute resolution procedure by the governing agency is to have its purpose fulfilled, then the decision of the governing body to approve the MOU must be binding and not subject to the uncertainty of referendum. The question posed by Justice Tobriner in *Glendale City Employees' Assn., Inc.* v. *City of Glendale, supra,* 15 Cal.3d 328, 336, is equally relevant to whether a MOU to which a governing body has agreed may be subjected to referendum: "Why negotiate an agreement if either party can disregard its provisions? . . . Why submit the agreement to the governing body for determination, if its approval were without significance? . . . The procedure established by the [MMBA] would be meaningless if the end-product, a labor-management agreement ratified by the governing body of the agency, were a document that was itself meaningless."

Stated differently, the effectiveness of the collective bargaining process under the MMBA rests in large part upon the fact that the public body that approves the MOU under section 3505.1—i.e., the governing body—is the same entity that, under section 3505, is mandated to conduct or supervise the negotiations from which the MOU emerges. If the referendum were interjected into this process, then the power to negotiate an agreement and the ultimate power to approve an agreement would be wholly divorced from each other, with the result that the bargaining process established by the MMBA could be undermined. This kind of bifurcation of authority between negotiators and decisionmakers would not be considered lawful were it to occur in the realm of private sector labor relations. (*N.L.R.B.* v. *Alterman*

---

[4]As explained in footnote 6, *post*, we do not decide whether the restriction of the referendum power for ordinances adopting or implementing MOU's applies to cities. We also do not decide if it applies to a consolidated city and county such as San Francisco.

*Transport Lines, Inc.* (5th Cir. 1979) 587 F.2d 212, 226-227.) As that case held, a company had engaged in bad faith bargaining when the president of the company—who had reserved to himself the right to bind the company to the agreement—failed to "at least brief his negotiators respecting his position and maintain some supervision over the proposals made and agreements reached." (*Id.* at p. 227; see also *Vainio dba Professional Eye Care* (1988) 289 NLRB 1376, 1391-1392; *Penntech Papers* (1982) 263 NLRB 264, 275, enforced 706 F.2d 18, cert. den. 464 U.S. 892 [78 L.Ed.2d 228, 104 S.Ct. 237].)

Similarly, section 3505.1 provides, in the language of private sector bargaining, a "reservation of rights" to the governing body to approve or disapprove any agreement emerging from the meet and confer process. On the other hand section 3505 mandates that the same governing body conduct or supervise the meet and confer process leading up to the agreement.[5] If the power of referendum existed, then the Legislature would in effect be sanctioning a kind of bad faith bargaining process in which those who possess the ultimate reservation of rights to approve the collective bargaining agreement—i.e., the electorate—are completely absent from the negotiating table.

We presume that the Legislature did not intend to compel local governmental entities to engage in a bargaining process that, unless the voters agreed, *could not* lead to a binding agreement even if the employer and employees desired to do so. Section 25123, subdivision (e)'s restriction of the local referendum right for ordinances adopting or implementing employer-employee MOU's is therefore wholly consistent with the overall purpose of the MMBA in promoting definitive resolution of labor-management disputes through the collective bargaining process. For purposes of resolving this case, we need not decide whether section 25123, subdivision (e) itself originates the restriction of the referendum power for the applicable ordinances in order to advance the statewide legislative purposes of the MMBA discussed above, or merely embodies the legislative recognition that the MMBA already implicitly contains such a restriction. (See fn. 3, *ante.*) In either case, the Legislature has made explicit its intent to restrict the

---

[5]The governing body's role in collective bargaining negotiations is further reinforced by section 54957.6, which provides an exception to the open meeting provisions of the Brown Act when a governing body consults "with the local agency's designated representatives regarding the salaries, salary schedules, or compensation paid in the form of fringe benefits of its represented and unrepresented employees and, for represented employees, any other matter within the statutorily-provided scope of representation." This statute, by permitting the governing body to meet in secret with its negotiating team during collective bargaining, underscores the Legislature's intent to assign the governing body the central role of directing the meet and confer process so as to achieve binding labor-management agreements.

referendum right for these ordinances, and such restriction is constitutionally justified: the Legislature's exercise of its preemptive power to prescribe labor relations procedures in public employment includes the power to exclusively delegate negotiating authority to the boards of supervisors, and therefore the power to curtail the local right of referendum.[6]

## C. *The PERS Statutes*

■ As discussed above, the ordinances exempt from referendum under section 25123, subdivision (e) are those "specifically [relating] to the *adoption* or *implementation* of a memorandum of understanding with an employee organization." (Italics added.) The Court of Appeal and VFRR correctly point out that it was not the November 5, 1991, adoption of the MOU's with the Employee Associations that effectively amended the County's contract with PERS, but rather the subsequent vote on the PERS amendment itself (Ordinance No. 1161) on December 17, 1991, that constituted the ratification of the amendment. Ordinance No. 1161, therefore did not "adopt" a memorandum of understanding within the meaning of section 25123, subdivision (e); if the ordinance is to be covered by this subdivision, it would have to be by virtue of the fact that the ordinance "implemented" an MOU. We must therefore consider whether and in what sense Ordinance No. 1161 implemented the November 5, 1991, MOU's and, more generally, how section 25123, subdivision (e), and the MMBA, can be reconciled with the statutory provisions governing the ratification of amendments to PERS contracts. Although VFRR does not raise arguments as to the applicability of section 25123, subdivision (e) to the present case, we address these questions briefly for purposes of clarification.

The process whereby the employees of a local public agency join PERS is closely regulated by statute. That process begins when "the governing body of a public agency" requests of the PERS board of administration "a quotation of the approximate contribution to this system which would be required of the agency for such participation." (§ 20451.) After receiving the quotation, the governing body may elect to approve the proposed contract with PERS and may state its intention to approve the contract via a

---

[6]We note that section 25123, subdivision (e) is applicable to counties only and has no counterpart for cities. (See § 36937.) We do not decide whether *city* ordinances that adopt or implement memorandums of understanding pursuant to the MMBA are subject to referendum.

resolution. (§ 20457.) Once the resolution is passed, the employees who are proposed to be included in PERS must approve the contract by secret ballot. (*Ibid.*)

Once the employees have approved the contract, then the contract is officially approved by the public agency in the following manner: "by ordinance adopted by the affirmative vote of a majority of the members of the governing body, not less than 20 days after the adoption of the resolution of intention, or by ordinance adopted by a majority vote of the electorate of the public agency voting thereon." (§ 20460.) Excluded employees may be included through amendments to the PERS contract "in the manner pre-scribed for the approval of the contracts," with some distinguishing features not pertinent here. (§ 20461.) In addition, section 7507 provides that the local legislative body, before adopting increases in public retirement benefits for its employees, must obtain actuarial evaluations of future annual costs of the plan, and make that cost information public "at a public meeting at least two weeks prior to the adoption of any increases in public retirement plan benefits."

In this case, the "adoption" of the amendment to the County's PERS contract, within the meaning of sections 20460 and 20461, took place on December 17, 1991, with the passage of Ordinance No. 1161, the ordinance which VFRR seeks to challenge via referendum. We reject the County's contention that, after having approved the MOU's on November 5, it had no discretion to reject Ordinance No. 1161 on December 17. Indeed, the MOU's make explicit that the County's initial approval of the retirement plan amendment on November 5 was tentative only, and depended for its final approval on fulfilling the relevant statutory requirements. As paragraph 08.03.00 of both MOU's provide: "Implementation of the PERS program as outlined above is contingent upon the agreement of all County bargaining groups and ratification of the Board of Supervisors, as well as, the approval of the majority of County employees through the required PERS election. Should the retirement plan not be implemented, due to any of these reasons, the County and the Association shall immediately reopen negotiations." Thus, as the MOU's properly recognized, the Board could not commit itself definitively to the retirement plan amendment until all the prescribed statu-tory steps had been taken.

Consequently, there is no conflict in this instance between the PERS statutes and either the MMBA or section 25123, subdivision (e). Here, both the PERS statutes and the memoranda of understanding negotiated under the MMBA required that the County not ultimately commit itself to amendment

of the PERS contract at the time of the adoption of the MOU's, but undertake additional procedures dictated by those statutes. What the County *did* commit itself to in the MOU's was to either (1) approve the amendment to the retirement plan, or (2) to "immediately reopen negotiations" regarding a county retirement plan. In other words, it had committed itself to in some fashion alter the present retirement plan, regarded by all parties as unsatisfactory. On December 17, 1991, the County chose the first option by the approval of Ordinance No. 1161, thereby fulfilling its commitment under the MOU's. As such, the choice that the Board made in passing Ordinance No. 1161 was specifically related to the "implementation of a memorandum of understanding with an employee organization" within the meaning of section 25123, subdivision (e), and was therefore not subject to referendum.

## IV. *Disposition*

We therefore conclude that Ordinance No. 1161 was not subject to referendum. The judgment of the Court of Appeal is reversed, with directions to affirm the judgment of the trial court.

Lucas, C. J., Arabian, J., Baxter, J., George, J., and Werdegar, J., concurred.

**KENNARD, J.**—I concur in the judgment and in all of parts I, III, and IV of the majority opinion. As for part II., I agree that article XI, section 1, subdivision (b) of the California Constitution (hereafter section 1(b)) neither prohibits nor guarantees the right of referendum on ordinances affecting the compensation of county employees. But I do not agree with the implication of the majority that an earlier version of the same constitutional provision (former § 5 of art. XI) secured to county voters the right of referendum on ordinances affecting county employee compensation.

## I. BACKGROUND

The California Constitution gives county voters a general power of referendum on county ordinances. Section 11 of article II provides: "Initiative and referendum powers may be exercised by the electors of each city or county under procedures that the Legislature shall provide." This provision derives from former section 1 of article IV, as amended in 1911.

In 1933, the Legislature decided to transfer its authority to set the compensation of county employees to the boards of supervisors of the various

counties. To accomplish this objective, it enacted a statute and proposed a constitutional amendment, which the voters of the state then adopted.

The statute, former Political Code section 4056d, continued in force all existing state laws affecting county employee compensation "as ordinances of the respective counties to which they relate" and provided that such laws "may be superseded, modified or otherwise affected by ordinances hereafter adopted in the respective counties and *subject to the rights of initiative, referendum and recall as reserved to the electors of such counties.*" (Stats. 1933, ch. 643, § 1, pp. 1674-1675, italics added.)

The constitutional amendment affected former section 5 of article XI (hereafter former section 5). As amended in 1933, former section 5 conferred on the "boards of supervisors in the respective counties" authority to "regulate the number, method of appointment, terms of office or employment, and compensation of all deputies, assistants, and employees of the counties." Former section 5 did not mention the right of referendum, but it did expressly validate former Political Code section 4056d, described above. The ballot pamphlet for the election on the 1933 amendment of former section 5 stated: "The act which is validated by this constitutional amendment carries out its purposes, and provides that present State laws fixing salaries shall be effective solely as local ordinances, and may be superseded by ordinance hereafter adopted, *subject to the regular initiative and referendum powers of the people.*" (Ballot Pamp., Proposed Amends. to Cal. Const. with arguments to voters, Special Statewide Elec. (June 27, 1933) p. 11, italics added.)

In June 1970, article XI of the state Constitution was reorganized. As part of this revision, former section 5 was repealed and its substantive provisions reenacted under different section numbers. The provision of former section 5 giving the boards of supervisors authority over county employee compensation was moved to section 1(b) with nonsubstantive changes in wording.[1]

In November 1970, section 1(b) was amended to give the boards of supervisors authority to set the compensation of their own members. This amendment, unlike the 1933 amendment of former section 5, included an express reference to the referendum power: "[E]ach governing body shall

[1]Former section 5 read: "The boards of supervisors in the respective counties . . . shall regulate the number, method of appointment, terms of office or employment, and compensation of all deputies, assistants, and employees of the counties." As enacted in 1970, section 1(b) read: "The governing body shall provide for the number, compensation, tenure, and appointment of employees."

prescribe by ordinance the compensation of its members, but the ordinance prescribing such compensation shall be subject to referendum."[2]

## II. ANALYSIS

In this court, both the defendant Board of Supervisors of Trinity County (hereafter Board) and the plaintiff Voters for Responsible Retirement (hereafter Voters) have argued that the history and language of section 1(b) support their respective positions.

The Board's position is that section 1(b) *prohibits* referendums on ordinances affecting county employee compensation. It reasons that because section 1(b) expressly provides for referendums on ordinances affecting compensation of supervisors, but not on ordinances affecting compensation of ordinary employees, it is both reasonable and necessary to infer that section 1(b) prohibits referendums in the latter situation.

Voters, on the other hand, contends that section 1(b) *guarantees* the right of referendum on ordinances affecting county employee compensation. It reasons that the 1933 amendment of former section 5 must be interpreted to effectuate the intent of the voters who enacted it, and that the voters' intent, as shown by the validation of former Political Code section 4056d and by the portion of the ballot pamphlet quoted above, was to make ordinances affecting county employee compensation subject to referendum. Therefore, according to Voters, the 1933 amendment secured the right of referendum on county employee compensation ordinances. The right thus secured was unaffected by the repeal of former section 5, because its substance was reenacted in section 1(b).

Neither argument is persuasive.

The 1933 amendment of former section 5 did not secure the right of referendum on ordinances affecting county employee compensation. Because county voters enjoyed general referendum powers under former section 1 of article IV (now § 11 of art. II), the Legislature recognized that

---

[2]In full, section 1(b) now reads: "The Legislature shall provide for county powers, an elected sheriff, an elected district attorney, an elected assessor, and an elected governing body in each county. Except as provided in subdivision (b) of Section 4 of this article, each governing body shall prescribe by ordinance the compensation of its members, but the ordinance prescribing such compensation shall be subject to referendum. The Legislature or the governing body may provide for other officers whose compensation shall be prescribed by the governing body. The governing body shall provide for the number, compensation, tenure, and appointment of employees."

compensation ordinances enacted by the boards of supervisors would be subject to referendum absent some statutory or constitutional provision barring referendum in this particular context. The language of former Political Code section 4056d, and the ballot pamphlet's discussion of that statute, merely reflect and acknowledge this reality.[3] Had the drafters of the 1933 amendment intended to provide an independent source in former section 5 for the right of referendum on ordinances affecting county employee compensation, they could have inserted language similar to that placed in the November 1970 amendment of section 1(b), which expressly secured the right of referendum on ordinances affecting the compensation of county supervisors. But they did not. Thus, the 1933 amendment of former section 5 did not *guarantee* the right of referendum on county employee compensation ordinances.

The November 1970 amendment of section 1(b) did not *prohibit* the referendum on ordinances affecting county employee compensation. The amendment expressly secured the referendum power for ordinances affecting county supervisor compensation, giving the referendum power for this particular class of county ordinances a source separate from and independent of the more general referendum guarantee embodied in section 11 of article II. The failure to similarly secure the referendum power for ordinances affecting the compensation of county employees did not have the effect of *prohibiting* the referendum in that context; it merely left the source of the referendum right for such ordinances where it had always been—in section 11 of article II. As the majority explains, it is understandable that the drafters of the November 1970 amendment chose to give the referendum over supervisors' salaries an independent constitutional basis to assure county voters that the Legislature could never abrogate the voters' authority to veto salary increases that county supervisors awarded themselves. Because the same inherent conflict of interest does not exist when supervisors vote on the compensation of other county employees, there was no similar need to give the referendum power a constitutional basis apart from (and more secure than) the general county referendum provision contained in section 11 of article II.

For these reasons, I agree with the majority that section 1(b) neither guarantees nor prohibits the right of referendum on ordinances affecting the

---

[3]No argument is made here that former Political Code section 4056d acquired constitutional force when it was validated by former section 5. The validation gave the statute validity *as a statute*, not as a part of the Constitution. It was treated as an ordinary statute in 1947, when it was repealed and reenacted as Government Code section 25301 (Stats. 1947, ch. 424, § 1, p. 1114, § 5, pp. 1307-1308), and again in 1973, when Government Code section 25301 was itself repealed (Stats. 1973, ch. 140, § 9, p. 376).

compensation of county employees. Because the power of referendum on such ordinances never received an independent constitutional basis, that power is and has been subject to the control of the Legislature in matters of statewide concern. The Legislature has exercised this control through Government Code section 25123, subdivision (e), providing that an ordinance adopting or implementing a memorandum of understanding takes effect immediately, thereby precluding referendum.