[No. A093769. First Dist., Div. Four. July 16, 2002.]

PERSONAL WATERCRAFT COALITION et al., Plaintiffs and Respondents, v.
MARIN COUNTY BOARD OF SUPERVISORS, Defendant and Appellant.

[No. A094088. First Dist., Div. Four. July 16, 2002.]

PERSONAL WATERCRAFT COALITION et al., Plaintiffs and Respondents, v.
MARIN COUNTY BOARD OF SUPERVISORS, Defendant and Respondent;
EARTH ISLAND INSTITUTE, Intervener and Appellant.

COUNSEL

Patrick K. Faulkner, County Counsel, and David L. Zaltsman, Deputy County Counsel, for Defendant and Appellant and for Defendant and Respondent.

Law Offices of Stephan C. Volker and Stephan C. Volker for Intervener and Appellant.

Hancock Rothert & Bunshoft, Brian A. Kelly, Jennifer L. Pruski; Birnberg & Associates and Cory A. Birnberg for Plaintiffs and Respondents.

**OPINION**

**KAY, P. J.**—The County of Marin (County) adopted an ordinance banning the use of personal watercraft on or within its territorial waters. The trial court determined that the ordinance was unconstitutionally vague on its face in terms of its territorial application. We hold that the ordinance does not

suffer from that constitutional infirmity. We also reject a number of other constitutional and statutory challenges to the validity of the ordinance.

BACKGROUND

In October of 1999 the Board of Supervisors for the County adopted Ordinance No. 3302, which added nine sections to the county code as chapter 11.36 (the Ordinance), entitled "Watercraft Regulation." The pertinent provisions may be summarized as follows:

Ordinance section 11.36.010 sets out a number of legislative findings and declares that "the purpose of this ordinance is to reduce existing conflicts and limit potential conflicts between uses of the shoreline waters and estuaries of Marin County, eliminate adverse impacts to the diverse and unusual species found in the shoreline waters and estuaries of Marin County, promote overall public safety, and decrease hydrocarbon pollution that is disproportionately caused by personal watercraft. [¶] Conflicts . . . have the potential to increase in the future because of increasing use of Marin County's marine waters as well as use and development of shoreline areas. Examples of conflicts that currently occur in addition to fish, marine mammal and wildlife habitat disruption are those between personal watercraft and individuals engaged in water sports such as kayaking, windsurfing, swimming, and canoeing, due to the nature and design of personal watercraft including high maneuverability, high speed, ability to travel in shallow areas, and noise patterns that are unique and annoying. [¶] These same unique characteristics of personal watercraft also cause conflicts between shoreline uses in areas zoned for residential and open space activities."

Ordinance section 11.36.020 defines "personal watercraft" as "a vessel . . . that is less than 12 feet in length, propelled by machinery, that is designed to be operated by a person sitting, standing, or kneeling on the vessel, rather than in the conventional manner of sitting or standing inside the vessel." It also defines "special-use area" as "all or a portion of a waterway that is set aside for specified uses or activities to the exclusion of other incompatible uses or activities."

Section 11.36.040 is the heart of the Ordinance. It provides:

"(a) Use and operation of personal watercraft in the area designated in subsection (b) as a special use area is incompatible with competing uses and is therefore prohibited.

"(b) For the purposes of this Chapter, the Special Use Area shall consist of all waters within the territory of the County of Marin accessible from a

shoreline, or the farthest extension of the shoreline of Marin County as defined by its landmarks. The area is to include the shoreline of the Pacific Ocean from the Sonoma County line to the Golden Gate Bridge and the San Francisco Bay shoreline from the Golden Gate Bridge to the Marin/Sonoma County line at the Petaluma River. The Special Use Area includes but is not limited to all Estuaries (Estero), rivers and bays within Marin County jurisdiction. This Special Use Area shall also include a distance of 7 miles inland from the mouth of the rivers or navigable creeks.

"In the event that another regulatory authority has exclusive jurisdiction over any of the shoreline of the Special Use Area, the Special Use Area shall begin at the boundary of the shoreline under the jurisdiction of the County of Marin."

Ordinance section 11.36.080 specifies that "Any violation of this chapter shall be deemed an infraction punishable" by a fine ranging from $100 to $500.

Plaintiffs herein are a number of entities and individuals that own, operate, and promote the use of personal watercraft commonly and generically known as "jet skis." They commenced two separate actions—subsequently consolidated—against the County to have the Ordinance declared invalid upon a number of constitutional and statutory grounds. The Earth Island Institute, the Environmental Action Committee of West Marin, and the Marin Audubon Society were allowed to intervene as defendants with the County.

Plaintiffs moved for summary judgment to have the ordinance declared unconstitutional on its face because it (1) was too vague to be enforceable; (2) violated plaintiffs' right of access to public waterways guaranteed by article X, section 4 of the California Constitution and the public trust doctrine; (3) exceeded the scope of regulation granted by section 660 of the Harbors and Navigation Code; (4) was preempted by federal statutes; and (5) constituted an unreasonable burden on interstate commerce.

The trial court granted plaintiffs' motion, stating in its order: "The court finds that Ordinance No. 3302 as it bans personal watercraft is void for vagueness. The Ordinance applies only to unincorporated waters in the county, but it provides no guidance to personal watercraft users as to the boundaries of those waters. Defendant's reliance on Government Code section 23121 fails. That ordinance [sic] does not identify the landmarks for the unincorporated versus the incorporated areas. . . . [Maps produced by the parties] show how difficult it would be to tell where a personal watercraft can and cannot be operated. Because of the court's conclusion on this issue, it has not addressed the remaining arguments raised by plaintiffs."

After it denied the County's motion for reconsideration and/or a new trial, the trial court entered a judgment declaring that "Marin County Ordinance 3302 is and at all times has been unconstitutional and invalid . . . ." The County and Earth Island Institute then perfected these timely appeals.

REVIEW

*The Ordinance Is Not Void for Vagueness*

In view of the fact that none of plaintiffs have been cited for violating the Ordinance, their challenge is to the validity of the Ordinance on its face, not as it may be applied. ■ A party claiming that a legislative enactment is invalid on its face confronts daunting obstacles to success. The first hurdle to overcome is the bedrock principle that courts are exceedingly reluctant to declare legislation unconstitutional. From this reluctance has come the oft-cited rule that "All presumptions and intendments favor the validity of a statute and mere doubt does not afford sufficient reason for a judicial declaration of invalidity. Statutes must be upheld unless their constitutionality clearly, positively and unmistakably appears." (*Lockheed Aircraft Corp. v. Superior Court* (1946) 28 Cal.2d 481, 484 [171 P.2d 21, 166 A.L.R. 701]; accord, *Voters for Responsible Retirement v. Board of Supervisors* (1994) 8 Cal.4th 765, 780 [35 Cal.Rptr.2d 814, 884 P.2d 645]; *Calfarm Ins. Co. v. Deukmejian* (1989) 48 Cal.3d 805, 814 [258 Cal.Rptr. 161, 771 P.2d 1247]; *Walker v. Superior Court* (1988) 47 Cal.3d 112, 143 [253 Cal.Rptr. 1, 763 P.2d 852]; *Wilson v. State Bd. of Education* (1999) 75 Cal.App.4th 1125, 1145 [89 Cal.Rptr.2d 745].) In implementing these principles courts presume that a Legislature did not intend to exceed the scope of its lawful power. From this presumption has developed the rule that courts will construe statutes in a manner that removes doubts as to constitutionality. (E.g., *Conservatorship of Wendland* (2001) 26 Cal.4th 519, 548 [110 Cal.Rptr.2d 412, 28 P.3d 151] and decisions cited; *In re Kay* (1970) 1 Cal.3d 930, 942 [83 Cal.Rptr. 686, 464 P.2d 142]; *Shealor v. City of Lodi* (1944) 23 Cal.2d 647, 653 [145 P.2d 574].) Another rule is that a statute "cannot be held void for uncertainty if any reasonable and practical construction can be given to its language." (*Lockheed Aircraft Corp. v. Superior Court, supra*, at p. 484; accord, *People ex rel. Gallo v. Acuna* (1997) 14 Cal.4th 1090, 1117 [60 Cal.Rptr.2d 277, 929 P.2d 596]; *Williams v. Garcetti* (1993) 5 Cal.4th 561, 568 [20 Cal.Rptr.2d 341, 853 P.2d 507].)

In mounting their facial challenge to the Ordinance, plaintiffs face additional difficulties. ■ "To support a determination of facial unconstitutionality, voiding the statute as a whole, petitioners cannot prevail by

suggesting that in some future hypothetical situation constitutional problems may possibly arise as to the particular *application* of the statute . . . . Rather, petitioners must demonstrate that the act's provisions inevitably pose a present total and fatal conflict with applicable constitutional prohibitions." (*Pacific Legal Foundation v. Brown* (1981) 29 Cal.3d 168, 180-181 [172 Cal.Rptr. 487, 624 P.2d 1215]; accord, *East Bay Asian Local Development Corp. v. State of California* (2000) 24 Cal.4th 693, 709 [102 Cal.Rptr.2d 280, 13 P.3d 1122] and decisions cited.) The last portion of this quote—the " ' " 'total and fatal conflict with applicable constitutional prohibitions' " ' . . ."—is the most important, for it requires plaintiffs to demonstrate " 'that *no set of circumstances exists under which the* [*Ordinance*] would be valid.' " (*Hatch v. Superior Court* (2000) 80 Cal.App.4th 170, 193 [94 Cal.Rptr.2d 453], quoting *United States v. Salerno* (1987) 481 U.S. 739, 745 [107 S.Ct. 2095, 2100, 95 L.Ed.2d 697]; accord, *People v. Rodriguez* (1998) 66 Cal.App.4th 157, 166-168 [77 Cal.Rptr.2d 676].) Our Supreme Court has put it even more plainly: "a claim that a law is unconstitutionally vague can succeed *only* where the litigant demonstrates . . . that the law is . . . 'impermissibly vague in *all of its applications.*' " (*People ex rel. Gallo v. Acuna, supra,* 14 Cal.4th 1090, 1116, quoting *Hoffman Estates v. Flipside, Hoffman Estates* (1982) 455 U.S. 489, 497-498 [102 S.Ct. 1186, 1193, 71 L.Ed.2d 362].) A facial challenge must fail if courts can conceive of a single situation in which the legislative enactment can be constitutionally applied. (See *Superior Court v. County of Mendocino* (1996) 13 Cal.4th 45, 59-61 [51 Cal.Rptr.2d 837, 913 P.2d 1046]; *Proposition 103 Enforcement Project v. Quackenbush* (1998) 64 Cal.App.4th 1473, 1494 [76 Cal.Rptr.2d 342].) Success comes only if the challenger demonstrates that the law is uncertain "*under any and all circumstances*" (*Superior Court v. County of Mendocino, supra,* at p. 60).

The concept of vagueness is founded on the most elemental constitutional concept of notice. ▉ "That the terms of a penal statute creating a new offense must be sufficiently explicit to inform those who are subject to it what conduct on their part will render them liable to its penalties, is a well-recognized requirement, consonant alike with ordinary notions of fair play and the settled rules of law. And a statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application violates the first essential of due process of law." (*Connally v. General Const. Co.* (1926) 269 U.S. 385, 391 [46 S.Ct. 126, 127, 70 L.Ed. 322]; see *People ex rel. Gallo v. Acuna, supra,* 14 Cal.4th 1090, 1115.) This does not, however, require that statutes must be drafted with the precision of a laser. A famous formulation by Justice Holmes advises "a criminal law is

not unconstitutional merely because it throws upon men the risk of rightly estimating a matter of degree" (*International Harvester Co. v. Kentucky* (1914) 234 U.S. 216, 223 [34 S.Ct. 853, 855, 58 L.Ed. 1284]; see *Nash v. United States* (1913) 229 U.S. 373, 377 [33 S.Ct. 780, 781, 57 L.Ed. 1232]). " 'Reasonable certainty is all that is required. A statute will not be held void for uncertainty if any reasonable and practical construction can be given its language.' [Citation.] It will be upheld if its terms may be made reasonably certain by reference to other definable sources," including "reference to other [statutes or] code provisions" (*American Civil Liberties Union v. Board of Education* (1963) 59 Cal.2d 203, 218 [28 Cal.Rptr. 700, 379 P.2d 4]; accord, *People ex rel. Gallo v. Acuna, supra,* at p. 1117; *People v. Superior Court (Hartway)* (1977) 19 Cal.3d 338, 345 [138 Cal.Rptr. 66, 562 P.2d 1315]; see *Rose v. Locke* (1975) 423 U.S. 48, 49-50 [96 S.Ct. 243, 243-244, 46 L.Ed.2d 185]). Other "definable sources" also include judicial decisions and common law (e.g., *County of Nevada v. MacMillen* (1974) 11 Cal.3d 662, 673 [114 Cal.Rptr. 345, 522 P.2d 1345]; *People v. McCaughan* (1957) 49 Cal.2d 409, 414 [317 P.2d 974]), legislative history, and other portions of the legislation. (E.g., *People ex rel. Gallo v. Acuna, supra,* at pp. 1116-1117; *Williams v. Garcetti, supra,* 5 Cal.4th 561, 569-570.) Finally, and sometimes most importantly, common sense is also to be considered. (E.g., *CSC v. Letter Carriers* (1973) 413 U.S. 548, 578-579 [93 S.Ct. 2880, 2897, 37 L.Ed.2d 796]; *International Harvester Co. v. Kentucky, supra,* at p. 223 [34 S.Ct. at pp. 855-856]; see *Jordan v. De George* (1951) 341 U.S. 223, 231-232 [71 S.Ct. 703, 708, 95 L.Ed. 886] ["common understanding and practices"].)

It should be obvious from the extent and variety of sources that may be consulted in determining the meaning and content of a statute that vagueness is not resolved by a simple perusal of statutory text. A person wondering whether a contemplated course of conduct is within a statutory prohibition is under a duty of inquiry to determine whether the latter will reach the former. "[B]ecause we assume that man is free to steer between lawful and unlawful conduct, we insist that laws give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly." (*Grayned v. City of Rockford* (1972) 408 U.S. 104, 108 [92 S.Ct. 2294, 2298-2299, 33 L.Ed.2d 222]; accord, *Hill v. Colorado* (2000) 530 U.S. 703, 732 [120 S.Ct. 2480, 2498, 147 L.Ed.2d 597]; see *Omaechevarria v. Idaho* (1918) 246 U.S. 343, 348 [38 S.Ct. 323, 325, 62 L.Ed. 763] ["Men . . . desirous of observing the law will have little difficulty in determining what is prohibited by it."]; 1 LaFave & Scott, Substantive Criminal Law (1986) § 2.3, pp. 128-129.) That duty does not end with the four corners of the statute, but extends to consulting "other definable sources" that may

dispel doubt and uncertainty. Difficulty in attempting to ascertain statutory meaning will neither excuse the failure to make the attempt, nor will it nullify the statute. (E.g., *Lockheed Aircraft Corp. v. Superior Court, supra,* 28 Cal.2d 481, 484; *County of Tulare v. City of Dinuba* (1922) 188 Cal. 664, 677-678 [206 P. 983].)

The parties have no dispute that the Ordinance, which declares a violation thereof to be "an infraction" that is "punishable" by a specified fine, constitutes a penal statute which must satisfy the due process requirement that it not be vague. (See Pen. Code, §§ 15, 16; *Jahns v. Nolting* (1866) 29 Cal. 507, 512; 1 Witkin & Epstein, Cal. Criminal Law (3d ed. 2000) Introduction to Crimes, § 14, pp. 13-14.) There is similar agreement that the individual plaintiffs have a constitutional right to access to and use of public waters. (Cal. Const., art. X, § 4; Gov. Code, § 39933; *Hildreth v. Montecito Creek W. Co.* (1903) 139 Cal. 22, 30 [72 P. 395]; *People ex rel. Younger v. County of El Dorado* (1979) 96 Cal.App.3d 403, 406 [157 Cal.Rptr. 815]; *People ex rel. Baker v. Mack* (1971) 19 Cal.App.3d 1040, 1050 [97 Cal.Rptr. 448].)

Plaintiffs have never taken the position that the Ordinance is vague because of the language in section 11.36.040 disclaiming intent to trespass upon the power of any "regulatory authority" having "exclusive jurisdiction" over any of the County's shoreline. ▉ The trial court was persuaded by plaintiffs' argument that the Ordinance lacked the requisite degree of constitutional precision because "nowhere in the Ordinance does it . . . mention the term 'unincorporated areas' or provide any geographical reference to understand where the unincorporated areas begin and end. This vagueness is compounded by the fact that the only 'guideline' provided in the Ordinance as to where in the County the law applies is the phrase, 'as defined by their natural landmarks.' But there is no navigational aid or other boundary markings to identify 'unincorporated areas.' . . . Nor does [the] ordinance reference buoys, sign posting, or general boundary information." This is far from the uncertainty required for a successful vagueness challenge.

Admittedly, Marin's shoreline is a checkerboard of jurisdictions. The coast of the County's western boundary is shared between county, state, and federal government; three miles out to sea, virtually every inch of coastline is within the Gulf of the Farralones and Monterey Bay national marine sanctuaries and therefore subject to federal jurisdiction. A map prepared by the County in another part of the record indicates distinct stretches of Pacific Ocean coastline that constitute "Marin County Jurisdictional Area[s]." The eastern coast of the County is much the same, with state jurisdiction over the

San Quentin peninsula and Angel Island State Park, federal jurisdiction of the Marin Islands National Wildlife Refuge, and—again as illustrated by the County's map—a number of shoreline areas subject to County jurisdiction.

Absence of express language in the Ordinance limiting its reach to "unincorporated areas" is without consequence, because the intention to limit the Ordinance to areas within the county's jurisdiction is implicit in all legislation enacted at the municipal or county levels, and a contrary intention need not be recited. (E.g., *City of Dublin v. County of Alameda* (1993) 14 Cal.App.4th 264, 274-275 [17 Cal.Rptr.2d 845]; *Stirling v. Board of Supervisors* (1975) 48 Cal.App.3d 184, 187 [121 Cal.Rptr. 435]; *People v. Velarde* (1920) 45 Cal.App. 520, 526-527 [188 P. 59].) Such a limitation is not only a "reasonable and practical construction" of the language of the Ordinance, one that dispels some of the claimed vagueness (*People ex rel. Gallo v. Acuna, supra,* 14 Cal.4th 1090, 1117; *Lockheed Aircraft Corp. v. Superior Court, supra,* 28 Cal.2d 481, 484), it is also a presumption required in favor of constitutionality that the board of supervisors did not mean to exceed their territorial authority. (See *Conservatorship of Wendland, supra,* 26 Cal.4th 519, 548; *Lockheed Aircraft Corp. v. Superior Court, supra,* at p. 484.)

An examination of plaintiffs' arguments both in the trial court and here establishes that their focus is not upon Marin's entire coastline, but only the eastern shoreline. As evidenced by a map marked "County of Marin Department of Public Works,"[1] they are concerned with the professed inability to differentiate areas of County jurisdiction from those of the chartered or incorporated cities of Sausalito, Belvedere, Tiburon, Corte Madera, San Rafael, and Novato. But implicit in this argument is that there are areas where the ordinance would apply. Thus, their contention that the Ordinance is unconstitutionally vague *on its face* must fail, because they cannot establish either that the Ordinance is " 'impermissibly vague in *all of its applications*' " (*People ex rel. Gallo v. Acuna, supra,* 14 Cal.4th 1090, 1116) or that " 'no set of circumstances exists under which the [Ordinance] would be valid.' " (*Hatch v. Superior Court, supra,* 80 Cal.App.4th 170, 193.) It is also significant to note that at no point have plaintiffs claimed to detect any uncertainty in that part of the Ordinance prohibiting personal watercraft for "a distance of 7 miles inland from the mouth of rivers or navigable creeks." This is another instance of uncontested validity for the Ordinance and thus another basis on which the Ordinance survives plaintiffs' vagueness attack. And there are still more reasons why the Ordinance passes constitutional muster.

---

[1]This map was produced before the trial court and is appended to plaintiffs' brief on this appeal.

The absence of a definition for the phrase "as defined by its landmarks" is equally benign; the landmarks constituting Marin's boundaries are set out by statute (Gov. Code, § 23121), which constitutes a readily obtainable "other definable sources" making the Ordinance reasonably certain and not vague. (*People ex rel. Gallo v. Acuna, supra,* 14 Cal.4th 1090, 1117; *American Civil Liberties Union v. Board of Education, supra,* 59 Cal.2d 203, 218.) Insofar as any city may have incorporated water frontage on Marin's eastern shoreline, they did so only with the approval of the State Lands Commission, which would have on file "a description of the boundaries, together with a map showing the boundaries" (Gov. Code, § 56740, subds. (a)-(c)). This state agency constitutes another "definable source" that makes the scope of the Ordinance "reasonably certain." (*American Civil Liberties Union v. Board of Education, supra,* 59 Cal.2d at p. 218.) Moreover, it must be presumed in support of the Ordinance's constitutionality that inquiry with the relevant local agencies and cities would have advised plaintiffs of the extent of the respective jurisdictions. (*Lockheed Aircraft Corp. v. Superior Court, supra,* 28 Cal.2d 481, 484.) Such a presumption is vindicated by information actually possessed by plaintiffs in the form of the map appended to their brief. As already mentioned, the map bears the legend "County of Marin Department of Public Works" and clearly delineates the areas of respective state, county, and municipal jurisdictions in San Francisco Bay.

It thus appears that there are considerable stretches along Marin's western and eastern borders where the identity and limits of the relevant jurisdictional authorities are not in dispute, and plaintiffs are aware of many portions of county coastline where they know operation of personal watercraft is prohibited. By reason of this information alone, plaintiffs cannot complain that all of the Ordinance's possible scope of application was an impenetrable mystery to them. Accordingly, because plaintiffs could determine some of the operative scope of the Ordinance, their contention that the Ordinance is unconstitutionally vague *on its face* must fail, because they cannot establish either that the Ordinance is " 'impermissibly vague in *all of its applications*' " (*People ex rel. Gallo v. Acuna, supra,* 14 Cal.4th 1090, 1116) or that " '*no set of circumstances exists under which the [Ordinance] would be valid.*' " (*Hatch v. Superior Court, supra,* 80 Cal.App.4th 170, 193.) Plaintiffs therefore cannot demonstrate that the claimed constitutional defect of the Ordinance " ' "clearly, positively, and unmistakably appears." ' " (*Voters for Responsible Retirement v. Board of Supervisors, supra,* 8 Cal.4th 765, 780; *Calfarm Ins. Co. v. Deukmejian, supra,* 48 Cal.3d 805, 814.)

In their brief plaintiffs note that they presented uncontradicted evidence that "there are no boundary markings, navigational buoys, signs or other

physical markers or advisories which define the areas or advise the user of areas where personal watercraft use is allowed and prohibited." The absence of such navigational aids does not relate to facial vagueness. Nor are plaintiffs able to cite a single instance where regulatory legislation, in order to satisfy due process, has been required to incorporate declarations of jurisdictional metes and bounds as if it were a grant deed. To require that amount of detail would be inconsistent with the principle that legislation does not have to possess the exactness of mathematical formulae. (E.g., *Armenta v. Churchill* (1954) 42 Cal.2d 448, 454 [267 P.2d 303]; *People v. Ewing* (1999) 76 Cal.App.4th 199, 209 [90 Cal.Rptr.2d 177]; *Gutknecht v. City of Sausalito* (1974) 43 Cal.App.3d 269, 274 [117 Cal.Rptr. 782].) If the concept of vagueness will permit a state to enact a statute requiring persons not to graze sheep on " 'any cattle range previously occupied by cattle, or upon any range usually occupied by any cattle grower . . . as a spring, summer or winter range for his cattle' " (*Omaechevarria v. Idaho, supra,* 246 U.S. 343, 345, fn. 3 [38 S.Ct. at p. 324]), there is no reason to believe it will forbid a county from passing an ordinance and making reference therein to the county's "jurisdiction."

The absence of boundary markings may be pertinent to a future argument that the Ordinance proves unconstitutionally vague as applied, but that is not a matter that can be addressed at this point in time. As county counsel conceded during oral argument there may be uncertainties in enforcement but those should be addressed later in a specific and concrete instance. Even if plaintiffs were able to cite authority requiring the necessity of aquatic signposts as a condition precedent to enforcement of the Ordinance (cf. Cal. Code Regs., tit. 14, §§ 4650, 4651, 4654, 4657, 4658 [state parks must post signs designating areas for swimming, surf riding, boat launching, and speed limits]), we would be obligated to presume that the County would provide them prior to exacting criminal penalties. (E.g., *Voters for Responsible Retirement v. Board of Supervisors, supra,* 8 Cal.4th 765, 780; *Calfarm Ins. Co. v. Deukmejian, supra,* 48 Cal.3d 805, 814.) The same is true with respect to the parties' dispute as to whether the Ordinance establishes a mens rea requirement.

The Ordinance has a single purpose—to forbid the operation of "personal watercraft" within the "special-use area." Both of those terms are defined. The Ordinance does not set forth a definition of "Marin County jurisdiction" mentioned in the definition of the special use area, but the term is not undefinable. Plaintiffs have not demonstrated that attempts to give substance and meaning to the term were or would be fruitless. The two maps to which we have referred prove that the extent of "Marin County jurisdiction" where

operation of personal watercraft is prohibited can be and could have been ascertained. The Ordinance is not so resistant to comprehension that it runs afoul of due process.

As previously mentioned, vagueness was the sole ground of plaintiffs' summary judgment motion that was addressed by the trial court; all of the remaining issues had previously been considered and rejected by the trial court when it denied plaintiffs' application for a preliminary injunction. Plaintiffs' other grounds will be examined de novo as issues of law in order to determine if the summary judgment may be affirmed on any of these other grounds. (E.g., *Ochoa v. California State University* (1999) 72 Cal.App.4th 1300, 1304 [85 Cal.Rptr.2d 768]; *Salazar v. Southern Cal. Gas Co.* (1997) 54 Cal.App.4th 1370, 1376 [63 Cal.Rptr.2d 522]; Code Civ. Proc., § 906; 9 Witkin, Cal. Procedure (4th ed. 1997) Appeal, § 342, p. 385.)

Plaintiffs next present a group of arguments that the County had no authority to enact the Ordinance and in doing so trespassed upon the exclusive power of the State of California (State).

*The Ordinance Does Not Foreclose Navigation and Does Not Violate the Public Trust Doctrine*

"No individual, partnership, or corporation, claiming or possessing the frontage or tidal lands of a harbor, bay, inlet, estuary, or other navigable water in this State, shall be permitted to exclude the right of way to such water whenever it is required for any public purpose, nor to destroy or obstruct the free navigation of such water; and the Legislature shall enact such laws as will give the most liberal construction to this provision, so that access to the navigable waters of this State shall be always attainable for the people thereof." (Cal. Const., art. X, § 4; see also Gov. Code, § 39933.) From its earliest days as a state, California treated tidelands as held in trust for the people for their use for commerce, navigation fishing, and other purposes. (E.g., *City of Berkeley v. Superior Court* (1980) 26 Cal.3d 515, 521 [162 Cal.Rptr. 327, 606 P.2d 362]; *People v. California Fish Co.* (1913) 166 Cal. 576, 584-585 [138 P. 79] and decisions cited; *People v. Gold Run D. & M. Co.* (1884) 66 Cal. 138, 151-152 [4 P. 1152].) ▮ The public trust doctrine is no longer confined to coastal areas lapped by the waves of the Pacific, but extends to nontidal bodies such as inland waterways and lakes, the lands beneath them, as well as any streams and tributaries that affect any navigable waters. (See *National Audubon Society v. Superior Court* (1983) 33 Cal.3d 419, 435-437 [189 Cal.Rptr. 346, 658 P.2d 709] and decisions cited.)

"The power of the state to control, regulate and utilize its navigable waterways and the lands lying beneath them, when acting within the terms of

the trust, is absolute . . . . [¶] . . . It is a political question, within the wisdom and power of the Legislature, acting within the scope of its duties as trustee, to determine whether public trust uses should be modified or extinguished . . . ." (*Marks v. Whitney* (1971) 6 Cal.3d 251, 260-261 [98 Cal.Rptr. 790, 491 P.2d 374].) The State, as trustee for the People, has the power to act "in any manner consistent with the improvement" of trust purposes. (*Colberg, Inc. v. State of California ex rel. Dept. Pub. Wks.* (1967) 67 Cal.2d 408, 419, 420 [62 Cal.Rptr. 401, 432 P.2d 3].) As will be shown in the next portion of this opinion, the State has elected to allow local government a measure of regulatory authority on matters that involve public trust waters. ■ Citing a number of statutes by which the State has conveyed tidelands to the County,[2] and the language in some of those grants ostensibly requiring the County to act only to promote specific statewide purposes (such as "fishing," "commerce and navigation"), plaintiffs contend that the Ordinance "forecloses" navigation and thereby violates both the conditions of the County's authority under the grants as well as their constitutional right to use the State's waterways.

Insofar as the State has made the political decision to share its authority with the County, that decision is beyond judicial scrutiny. (*Marks v. Whitney, supra,* 6 Cal.3d 251, 260-261.) In addition, the public trust doctrine has been expanded beyond its traditional common law emphasis on commerce, navigation, and fisheries; it is now construed as "sufficiently flexible to encompass changing public needs" (*id.* at p. 259), such as concern for the environment, expanding recreational uses, and aesthetic preservation. (E.g., *National Audubon Society v. Superior Court, supra,* 33 Cal.3d 419, 434-435; *City of Berkeley v. Superior Court, supra,* 26 Cal.3d 515, 521.) The tideland grant statutes cited by plaintiffs cannot be construed as limiting the scope of the public trust uses whose regulation the State is willing to share with the County. (See *State of California v. Superior Court (Lyon)* (1981) 29 Cal.3d 210, 230-231 [172 Cal.Rptr. 696, 625 P.2d 239].) The fact that that willingness is expressed in statutory form means that plaintiffs cannot argue that plenary legislative power resides exclusively in Sacramento. "There can be no implied preemption of an area where state law expressly allows supplementary local legislation." (*Suter v. City of Lafayette* (1997) 57 Cal.App.4th 1109, 1121 [67 Cal.Rptr.2d 420].) The nature and scope of that power sharing will be examined next.

---

[2](Stats. 1957, ch. 800, § 1, pp. 2012-2013; Stats. 1959, ch. 497, § 1, pp. 2436-2438; Stats. 1965, 1st Ex. Sess. 1964, ch. 49, §§ 1-2, pp. 183-184; Stats. 1967, ch. 1391, §§ 1-3, pp. 3253-3255; Stats. 1969, ch. 787, § 1, pp. 1603-1606; Stats. 1969, ch. 1375, § 1, pp. 2818-2822; Stats. 1974, ch. 813, § 1, pp. 1769-1773; Stats. 1975, ch. 898, § 1, pp. 1985-1990.)

*The Ordinance Does Not Exceed the Authority Granted the County by*
*Harbors and Navigation Code Section 660*

 Notwithstanding certain expressions of the nature of the State's public trust power, plaintiffs are incorrect in treating state power as exclusive and admitting of no local regulation that goes beyond time-manner-place restriction to a total prohibition of a lawful activity. The State may be preeminent, but it has not preempted the field to itself. Cities and counties have, within their allotted sphere, the same array of constitutional regulatory police powers as does the State. (Cal. Const., art. XI, § 7; *Candid Enterprises, Inc. v. Grossmont Union High School Dist.* (1985) 39 Cal.3d 878, 885 [218 Cal.Rptr. 303, 705 P.2d 876].) The Supreme Court has also spoken of the State as retaining "continuing supervisory control over its navigable waters and the lands beneath those waters." (*National Audubon Society v. Superior Court, supra,* 33 Cal.3d 419, 445.) As may be evident from the term "supervisory," the State recognizes a legitimate scope for county regulation in matters touching navigable waters that is consistent with purposes of the public trust.

Harbors and Navigation Code section 660 codifies that recognition. Subdivision (a) of that statute provides in pertinent part: "Any ordinance, law, regulation, or rule relating to vessels, which is adopted . . . by any entity other than the department [of Boating and Waterways], including . . . any county . . . shall, notwithstanding any other provision of law, pertain only to time-of-day restrictions, speed zones, *special-use areas*, and sanitation and pollution control . . . ." (Italics added.) Another provision of the same code authorizes counties to "adopt restrictions concerning the navigation and operation of vessels and water skis, aquaplanes, or similar devices subject to the provisions of subdivision (a) of Section 660," and extends this authority to "all" navigable waters. (Harb. & Nav. Code, § 268.) The Harbors and Navigation Code defines "special-use area" to mean "all or a portion of a waterway that is set aside for specified uses or activities to the exclusion of other incompatible uses or activities," and defines "vessel" as "every description of watercraft used or capable of being used as a means of transportation on water" (Harb. & Nav. Code, § 651, subds. (v) & (aa)). There are numerous other provisions demonstrating that county power does not end at the edge of navigable waters.[3]

Plaintiffs point to a single decision addressing Harbors and Navigation Code section 660 and the authority of counties to legislate concerning

---

[3](E.g., Harb. & Nav. Code, §§ 782 [county may regulate sewage discharge from vessels], 4001 [county may authorize construction of wharves], 4040 [county may issue bonds for harbor improvement], 4131 [county may "improve, develop, protect, and maintain" harbors].)

navigable waters within the public trust. All of their arguments derive from, and depend upon, this sole authority, *People ex rel. Younger v. County of El Dorado, supra*, 96 Cal.App.3d 403.

During the 1970's a section of the American River in El Dorado County became one of the most popular whitewater rafting areas in the state. Responding to complaints of the property owners adjacent to the river, the county board of supervisors enacted an ordinance making it unlawful "to float, swim or travel . . . by artificial means" on the river; violations were declared a misdemeanor. The trial court refused to enjoin enforcement of the ordinance. The Court of Appeal for the Third District framed the issue on appeal thus: "May a county ban all rafting and boating on a section of a navigable river highly suited to and much used for such recreational activities?" (*People ex rel. Younger v. County of El Dorado, supra*, 96 Cal.App.3d 403, 405.) The court concluded that the county could not. Because of its importance to plaintiffs' arguments, the court's reasoning warrants quotation at length.

"As asserted by defendants, the critical issue is whether the challenged ordinance is a reasonable exercise of the county's police powers. Harbors and Navigation Code section 660 limits these powers to enactment of measures pertaining to 'time-of-day restrictions, speed zones, special-use areas, and sanitation and pollution control' which do not conflict with other state laws.

"The ordinance is neither a permissible special use-area designation nor a reasonable sanitation and pollution control measure. On its face, it is an absolute prohibition against boating by the public. The record shows that the affected section of the river is not a significant fishing stream, and partly because of restricted access, fishing is light. Swimming in whitewater areas without such artificial means as lifejackets is obviously neither popular nor safe. Thus the ordinance effectively bans virtually all public use of the river.

"However laudable its purpose, the exercise of police power may not extend to total prohibition of activity otherwise lawful. [Citations.] Courts are especially sensitive to infringements upon constitutional rights under the guise of exercise of police power. [Citations.] The public's right of access to navigable streams is a constitutional right. [Citations.]

"The trial court relied on an Attorney General's opinion that an ordinance banning motorboat operations on a portion of the American River in Sacramento County established a special-use area (45 Ops.Cal.Atty.Gen. 122 (1965)). Its reliance was misplaced. While we express no opinion as to the

correctness of the analysis or conclusion in that opinion, we distinguish a situation in which exclusion of power boats from an area better suited to 'non-power' uses (*id.*, at p. 123) protects the environment and fosters other recreational uses from the present situation in which *all* forms of 'travel by artificial means' are excluded from an area ideally suited to such activity. The El Dorado County ordinance is not a special-use area designation; it is virtually a no-use area designation.

"While obviously effective to eliminate pollution and sanitation problems, the ordinance goes too far. The county contends use prohibition is the only way to eliminate pollution and sanitation problems. But the logical extension of this hypothesis is the prohibition of all industry, agriculture, and even human habitation, the effect of which would be to eliminate pollution entirely. The public has a right to use the river;°it has no right to pollute the river. Reasonable regulation is in order; use prohibition is not. The problems of pollution and sanitation in our increasingly crowded state are difficult and complex, calling for imaginative and sophisticated solutions. But total prohibition of access is an impermissible solution. The ordinance is invalid because it denies the constitutional right of the public to use of and access to a navigable stream." (*People ex rel. Younger v. County of El Dorado, supra,* 96 Cal.App.3d 403, 406-407.)

*County of El Dorado* does not stand for the proposition that counties have no legislative authority over navigable waters within public trust areas. Indeed, the decision makes no mention of the State's public trust jurisdiction. *County of El Dorado* does stand for the simple proposition that county authority cannot be exercised in a blunderbuss fashion that effectively nullifies public access to, and use of, public shoreline waters.[4] The court made clear that the scope of possible uses was limited; "fishing is light," swimming possible only with "such artificial means as lifejackets" as the ordinance prohibited, and boating, which the ordinance also prohibited. (*People ex rel. Younger v. County of El Dorado, supra,* 96 Cal.App.3d 403,

---

[4]Plaintiffs do cite other decisions invalidating local legislation or acts, which literally precluded or virtually impeded *all* public access to public waterways. (*Kern River Public Access Com. v. City of Bakersfield* (1985) 170 Cal.App.3d 1205 [217 Cal.Rptr. 125] [city approved final map of subdivision along river without requiring easement for public access]; *Hitchings v. Del Rio Woods Recreation & Park Dist.* (1976) 55 Cal.App.3d 560 [127 Cal.Rptr. 830] [district prevented public access to navigable portion of the Russian River]; *Lane v. City of Redondo Beach* (1975) 49 Cal.App.3d 251 [122 Cal.Rptr. 189] [city redevelopment plan would have closed public access to ocean beach].) Here, access to Marin's waters is not truly at issue; the Ordinance does not stop people from going to the seashore. What is at issue is what people may do on those waters after they have reached the seashore. Accordingly, the issue before us does not, in any real sense, implicate the public's right to access to public waterways.

406). In addition, "Most of the land on both sides of the river is privately owned and access to the water is limited." (*Id.* at p. 405.) The court thus reached the logical conclusion that the effect of the ordinance was a "total prohibition of access," thereby making the "special-use area . . . virtually a no-use area" (*id* at p. 407).

The county legislation under consideration here, however, is considerably more modest in scope and purpose. It prohibits only a single use—that of personal watercraft—and does so in order to preserve and promote more numerous other uses of the County's waterways. The Ordinance recites a number of findings reflecting the extensive hearings and research on the problem done by other agencies, and concludes that personal watercraft "have a negative impact on almost every other activity occurring in the same area. PWC [personal watercraft] destroy the outdoor experience for other recreationalists such as swimmers, surfers, windsurfers, kayakers, canoers, hikers, birdwatchers, fishers, and tourists by creating noise, hazardous conditions, congestion, and causing wildlife to flee."[5] The Ordinance does not ban boating (naturally or artificially powered) or other activities related to

[5]Plaintiffs attack these findings as having been made without any supporting evidence. This argument is rejected on the grounds that (1) the statutory argument plaintiffs are making here does not permit judicial examination of the *legislative* findings made by the board of supervisors and recited in the Ordinance (e.g., *Connecticut Indemnity Co. v. Superior Court* (2000) 23 Cal.4th 807, 814-816 [98 Cal.Rptr.2d 221, 3 P.3d 868]; *Dittus v. Cranston* (1959) 53 Cal.2d 284, 286 [1 Cal.Rptr. 327, 347 P.2d 671]; *Galeener v. Honeycutt* (1916) 173 Cal. 100, 103-105 [159 P. 595]; cf. *Professional Engineers v. Department of Transportation* (1997) 15 Cal.4th 543, 569 [63 Cal.Rptr.2d 467, 936 P.2d 473] [appearing to suggest that when legislation is claimed to violate Constitution court will not treat legislative findings as conclusive but will determine if legislature " 'has drawn reasonable inferences based on substantial evidence' "]); (2) plaintiffs have failed to comply with the rule requiring all pertinent evidence to be summarized in their brief (e.g., *In re Marriage of Fink* (1979) 25 Cal.3d 877, 887-888 [160 Cal.Rptr. 516, 603 P.2d 881]; *Foreman & Clark Corp. v. Fallon* (1971) 3 Cal.3d 875, 881 [92 Cal.Rptr. 162, 479 P.2d 362]); and (3) the record on appeal is replete with material detailing adverse impacts and consequences of personal watercraft use including a report and study forwarded to the board of supervisors by the Richardson Bay Regional Agency and analyzed by the board's own staff, a report on "Jet Ski Use Impacts along the Marin County Shoreline," and numerous materials from state and federal agencies curtailing or prohibiting personal watercraft use. Of particular note were the prohibitions of jurisdictions adjacent to, and in some cases including parts of, the Marin coastline—San Francisco, Sausalito, the Golden Gate National Recreation Area, the Point Reyes National Seashore (36 C.F.R. § 1.7(b) (2001) Compendium), the Monterey Bay National Marine Sanctuary (15 C.F.R. § 922.132 (2001)), and the Gulf of the Farallones National Marine Sanctuary (15 C.F.R. § 922.82 (2001)). There are also reports on personal injuries and environmental damage caused by personal watercraft. Some of these materials are cited and even quoted in the Ordinance. Plaintiffs appear to suggest that it was improper for the board of supervisors to rely upon this information without conducting its own research that considered only the County's waters. In the absence of a showing that research conducted by other agencies has been superceded, impeached, or otherwise discredited, we discern no reason why the board of supervisors was not entitled to consider and rely upon such materials.

boating such as waterskiing. There is nothing in the record indicating that the Ordinance will prevent public access to or use of waterways. Nothing suggests that owners of property fronting the shoreline are given a preference denied to others. The Ordinance here is thus distinguishable from the ordinance considered in *County of El Dorado.*

The Ordinance under view may also have the benefit of several considerations coming into play after *County of El Dorado* was decided. First, the Legislature in 1988 adopted a statutory definition of "special-use area." (Harb. & Nav. Code, § 651, subd. (v), added by Stats. 1988, ch. 216, § 2, pp. 835-837.) It thus gave explicit statutory sanction to the power of local legislatures to "set aside" "*all* or a portion of a waterway . . . for specified uses or activities *to the exclusion of other incompatible uses or activities.*" (Italics added.) Federal courts have long accepted that regulation is synonymous with the power to exclude or prohibit. (E.g., *In re Rahrer* (1891) 140 U.S. 545 [11 S.Ct. 865, 35 L.Ed. 572] [Congress's power to regulate commerce permits delegation of power to prohibit alcohol]; *Champion v. Ames* (1903) 188 U.S. 321 [23 S.Ct. 321, 47 L.Ed. 492] [lottery tickets]; *Hipolite Egg Co. v. United States* (1911) 220 U.S. 45 [31 S.Ct. 364, 55 L.Ed. 364] [adulterated food & drugs]; see *Hammer v. Dagenhart* (1918) 247 U.S. 251, 277 [38 S.Ct. 529, 533, 62 L.Ed. 1101, 3 A.L.R. 649] (dis. opn. of Holmes, J.) ["It would not be argued today that the power to regulate does not include the power to prohibit. Regulation means the prohibition of something . . . ."], overruled by *United States v. Darby* (1941) 312 U.S. 100, 113 [61 S.Ct. 451, 456, 85 L.Ed. 609, 132 A.L.R. 1430 ["prohibition . . . is indubitably a regulation"].) California courts have gone at least as far, particularly with respect to navigable waters. "The supreme control of the state over its navigable waters . . . embraces within it not alone the power to destroy the navigability of certain waters for the benefit of others, but . . . in short, to do anything subserving the great purpose . . . ." (*Gray v. Reclamation District No. 1500* (1917) 174 Cal. 622, 636 [163 P. 1024], accord, *Colberg, Inc. v. State of California ex rel. Dept. Pub. Wks., supra,* 67 Cal.2d 408, 418; see *Young v. Department of Fish & Game* (1981) 124 Cal.App.3d 257, 279 [177 Cal.Rptr. 247] ["The Legislature's power to regulate . . . includes the power to prohibit."].) Prohibition does not, therefore, establish a per se excess of regulatory power.

Second, the Attorney General has already visited the precise issue before us. He concluded in 1991 that "A local agency may prohibit personal watercraft on all navigable waters within its jurisdiction if the use of personal watercraft is incompatible with one or more other public uses on such waters and the ban is nondiscriminatory as to personal watercraft." (74

Ops.Cal.Atty.Gen. 174, 175 (1991).) This conclusion was based in part on the recently enacted statutory definition of special-use area, and an examination of *County of El Dorado*. ■ This opinion is not binding on us, but it is " 'entitled to great respect.' " (*California Assn. of Psychology Providers v. Rank* (1990) 51 Cal.3d 1, 17 [270 Cal.Rptr. 796, 793 P.2d 2].) Such deference is particularly appropriate when the State's chief law enforcement officer detects no infringement upon the State's authority concerning this important subject.

■ Plaintiffs characterize Harbors and Navigation Code section 660 as "limited," granting localities only a "very narrow regulatory authority," which "can not be interpreted to provide a limitless, broad-sweeping authority to prohibit all personal watercraft from . . . any waters accessible from a Marin shoreline. The massive Marin shoreline is as diverse as it is extensive. It affords a broad range of navigational and recreational opportunities. To claim that all waters constitute a single use area that is without exception incompatible with personal watercraft use is intellectually dishonest." In addition, plaintiffs appear to argue that the statutory definition of "special-use area" requires that an ordinance establishing such an area must recite the uses or activities that are in need of protection, and then designate the incompatible use that is being excluded.

Plaintiffs do not explain how intellectual dishonesty amounts to a legal defect in a legislative enactment but we will assume that this is a complaint of abuse of discretion. We are required to consider the Ordinance as a whole, with regard for each of its parts. (E.g., *City of Huntington Beach v. Board of Administration* (1992) 4 Cal.4th 462, 468 [14 Cal.Rptr.2d 514, 841 P.2d 1034]; *California Assn. of Psychology Providers v. Rank, supra,* 51 Cal.3d 1, 18.) So considered, there can be no doubt as to the what and the why of the Ordinance.

Section 11.36.010 of the Ordinance states in pertinent part: "With respect to the prohibition of personal watercraft within all shoreline waters and estuaries of Marin County, the purpose of this ordinance is to reduce existing conflicts and limit potential conflicts between uses of the shoreline waters and estuaries of Marin County, eliminate adverse impacts to the diverse and unusual species found in the shoreline waters and estuaries of Marin County, promote overall public safety, and decrease hydrocarbon pollution that is disproportionately caused by personal watercraft. [¶] Conflicts between uses have the potential to increase in the future because of increasing. use of Marin County's marine waters as well as use and development of shoreline areas. Examples of conflicts that currently occur in addition to fish, marine

mammal and wildlife habitat disruption are those between personal watercraft and individuals engaged in water sports such as kayaking, windsurfing, swimming, and canoeing, due to the nature of and design of personal watercraft including high maneuverability, high speed, ability to travel in shallow areas and noise patterns that are unique and annoying. [¶] These same unique characteristics of personal watercraft also cause conflicts between shoreline uses in areas zoned for residential and open space activities." Other parts of the Ordinance record the board's concern for recreational uses on land enjoyed by "hikers, . . . birdwatchers, bicyclists, . . . tourists and outdoor enthusiasts." Another finding is even more emphatic: "[U]nlike other forms of recreation, PWC have a negative impact *on almost every other activity occurring in the same area*. PWC destroy the outdoor experience for other recreationalists such as swimmers, surfers, windsurfers, kayakers, canoers, hikers, birdwatchers, fishers, and tourists by creating noise, hazardous conditions, congestion, and causing wildlife to flee." (Italics added.)

It is clear from section 11.36.010 and other findings set out in the Ordinance that the board of supervisors believed the use of personal watercraft was outweighed by other considerations and uses of the public waterways. It is obvious from these findings that personal watercraft use was deemed incompatible with the numerous other uses enjoyed on both the eastern and the western shorelines of the County which were specified in the Ordinance; the board of supervisors believed personal watercraft entailed incompatible consequences no matter where they might be used. We cannot conclude that the board abused its discretion in deciding to deal with the subject of personal watercraft on a countywide basis.

In conclusion, the Ordinance is not incompatible with Harbors and Navigation Code section 660. The definitions of the terms "personal watercraft" and "special-use area" set forth in the Ordinance are virtually identical to those employed in the Harbors and Navigation Code.[6] Both definitions of "special-use area" contemplate the legislative function of preferring certain uses of waterways that necessitate "the exclusion of other incompatible uses or activities." Both definitions allow "all or a portion" of waterways to be included within a "special-use area." The County, acting through its board of supervisors, has chosen to exercise legislative preference for the vastly greater number of other uses and activities for which its waterways may be used, to the exclusion of the operation of personal watercraft. Only a single

---

[6]The sole difference is that the Ordinance defines personal watercraft as "less than 12 feet in length," while the state statute sets the length at "13 feet . . . or less" (Harb. & Nav. Code, § 651, subd. (s)).

mode of navigation is, to adopt plaintiffs' term, "foreclosed," and then only after the county legislature determined that the continued use of personal watercraft was overborne by the adverse impacts on numerous countervailing interests of other waterway users and the peaceful enjoyment of persons on adjacent shorelines.[7]

Accordingly, if plaintiffs are contending that the State has preempted the regulatory field to the exclusion of all other units of local government, we cannot agree. ▇▇▇ Local legislation may be preempted if it duplicates, contradicts, or enters a field already fully occupied by state law. (E.g., *IT Corp. v. Solano County Bd. of Supervisors* (1991) 1 Cal.4th 81, 90 [2 Cal.Rptr.2d 513, 820 P.2d 1023]; *Candid Enterprises, Inc. v. Grossmont Union High School Dist., supra*, 39 Cal.3d 878, 885.) ▇▇▇ The Ordinance does not duplicate state law because it is not coextensive with state law. It does not contradict state law because it does not prohibit that which state law allows. As shown by the express language of Harbors and Navigation Code section 660, the Ordinance enters a field the State is clearly willing to share with local government. Preemption is not established by these circumstances. (See *Sherwin-Williams Co. v. City of Los Angeles* (1993) 4 Cal.4th 893, 897-898 [16 Cal.Rptr.2d 215, 844 P.2d 534], and decisions cited; *Suter v. City of Lafayette, supra*, 57 Cal.App.4th 1109, 1121.)

Having failed to persuade us that the County usurped powers belonging solely to the State, plaintiffs then argue that neither the County nor the State is empowered to act in this field, because regulatory authority belongs solely to the federal government.

*The Ordinance Is Not Preempted by the Federal Boat Safety Act*

▇▇▇ The Federal Boat Safety Act of 1971 (46 U.S.C. §§ 4301-4311) gives the Secretary of Transportation authority to issue regulations "establishing minimum safety standards for recreational vessels and associated equipment, and establishing procedures and tests required to measure conformance with those standards," as well as requiring or prohibiting "the installation, carrying or use of associated equipment" on such vessels. (46 U.S.C. § 4302(a)(1), (2).) It further provides that "a State or political subdivision of a State may not establish, continue in effect, or enforce a law or regulation establishing a recreational vessel or associated equipment performance or other safety standard or imposing a requirement for associated

---

[7]In light of the findings quoted above reciting the diverse ways in which Marin's territorial waters are used and will be promoted by the Ordinance, it is obvious that numerous aquatic uses will remain available to the public. Plaintiffs' argument that the Ordinance "forecloses" navigation may therefore be dismissed as hyperbole.

equipment . . . that is not identical to a regulation prescribed" by the Secretary of Transportation. (46 U.S.C. § 4306.) We do not agree with plaintiffs' argument that this federal legislation displaces the County's power to enact the Ordinance.

The adoption of the Ordinance here was enacted in part by considerations of public safety, but it does not purport to establish "minimum safety standards" for recreational vessels. The Ordinance is entirely silent as to the subject of "associated equipment." Most of the reported decisions addressing the scope of preemption concern common law tort claims against vessel manufacturers. (See *Lady v. Neal Glaser Marine, Inc.* (5th Cir. 2000) 228 F.3d 598, 601-602, and decisions cited.) The only relevant authority cited by the parties comes from Hawaii, where the Supreme Court rejected the preemption claim aimed at overturning a state statute banning operation of personal watercraft on specified days at two specific areas, stating: "[S]imply because commercial thrill craft must be held to a federal standard regarding performance and safety standards, it does not follow that the State is thereby precluded from restricting the time periods during which those same thrill craft may be operated in State waters. The two areas of regulation are distinct from one another." (*Kaneohe Bay Cruises, Inc. v. Hirata* (1993) 75 Hawaii 250 [861 P.2d 1, 10].) We agree with this reasoning. The Ordinance touches upon none of the concerns that warrant federal preemption of a traditional subject of local regulation. (See *Pleasant Hill Bayshore Disposal, Inc. v. Chip-It Recycling, Inc.* (2001) 91 Cal.App.4th 678, 685-686 [110 Cal.Rptr.2d 708], and decisions cited.)

*The Ordinance Is Not Preempted by the Federal Clean Air Act*

Plaintiffs contend that the Ordinance is preempted by this provision of the Federal Clean Air Act (42 U.S.C. § 7401 et seq.):

"(e) Nonroad engines or vehicles

"(1) Prohibition on certain State standards

"No State or any political subdivision thereof shall adopt or attempt to enforce any standard or other requirement relating to the control of emissions from either of the following new nonroad engines or nonroad vehicles . . . .

"(A) New engines which are used in construction equipment or vehicles or used in farm equipment or vehicles and which are smaller than 175 horsepower.

"(B) New locomotives or new engines used in locomotives. . . .

"(2) Other nonroad engines or vehicles

"(A) In the case of any nonroad vehicles or engines other than those referred to in subparagraph (A) or (B) of paragraph (1), the Administrator [of the Environmental Protection Agency] shall . . . authorize California to adopt and enforce standards and other requirements relating to the control of emissions from such vehicles or engines if California determines that California standards will be, in the aggregate, at least as protective of public health and welfare as applicable Federal standards. . . ." (42 U.S.C. § 7543(e).)[8]

We cannot agree with plaintiffs' reasoning that because the board of supervisors was concerned with reducing pollution, the Ordinance is therefore preempted. The purpose of the preemption provisions of the Clean Air Act is not to hamstring local efforts to reduce air pollution but to prevent the burden on interstate commerce resulting from a multiplicity of conflicting state and local exhaust emission standards. (*Engine Mfrs. Ass'n v. South Coast Air Quality* (C.D.Cal. 2001) 158 F.Supp.2d 1107, 1110; *Allway Taxi, Inc. v. City of New York* (S.D.N.Y. 1972) 340 F.Supp. 1120, 1124.) Without question, concern for the environmental damage caused by personal watercraft was one of the motivations behind adoption of the Ordinance. Nevertheless, there is nothing in the Ordinance that suggests that the County was purporting to adopt "standards and other requirements relating to the control of emissions."

Plaintiffs' reliance on *American Auto. Mfrs. Ass'n v. Cahill* (2d Cir. 1998) 152 F.3d 196 is misplaced because that decision is obviously distinguishable. The New York regulation struck down in *Cahill* required a percentage of vehicles sold within the state to be "zero-emission." Clearly, by defining, on the basis of the amount of exhaust emissions, a class and number of zero-emission vehicles, which must be sold per year, the state had enacted a standard "relating to the control of emissions" of those vehicles within the scope of the preemption. (*Id.* at p. 200.) By contrast, the Ordinance here defines personal watercraft on the basis of length and design, not by the amount or nature of any emission they produce. Moreover, the legislative findings recited in the Ordinance establish that emissions were only one of a number of factors, which motivated the board of supervisors to adopt the

---

[8]The Clean Air Act defines "nonroad engine" as "an internal combustion engine (including the fuel system) that is not used in a motor vehicle or a vehicle used solely for competition" and "nonroad vehicle" as "a vehicle that is powered by a nonroad engine and that is not a motor vehicle or a vehicle used solely for competition." (42 U.S.C. § 7550(10) & (11).)

Ordinance. Congress intended the Clean Air Act to be a concerted effort against pollution by all levels of government, federal, state, and local. (See 42 U.S.C. §§ 7402(a), 7408(f).) The Clean Air Act has been interpreted to permit local adoption of "in-use regulations" even when such measures "are expressly intended to control emissions." (*Engine Mfrs. Ass'n v. U.S. E.P.A.* (D.C. Cir. 1996) 88 F.3d 1075, 1094.) There is nothing about the Ordinance that suggests that Marin's effort should not receive a similar tolerance.[9]

### The Ordinance Does Not Violate the Commerce Clause

■ The power of Congress "To regulate commerce . . . among the several states" (U.S. Const., art. I, § 8, cl. 3) has a dual nature; it is positive in that it is a grant of power to the national government, and negative in that it is a limitation upon the regulatory power of the states. Even in the absence of a conflicting federal statute, the commerce clause prevents states from passing legislation, which discriminates against, or burdens interstate commerce. (E.g., *Oregon Waste Systems, Inc. v. Department of Environmental Quality of Ore.* (1994) 511 U.S. 93, 98 [114 S.Ct. 1345, 1349, 128 L.Ed.2d 13]; *Wyoming v. Oklahoma* (1992) 502 U.S. 437, 454 [112 S.Ct. 789, 800, 117 L.Ed.2d 1]; *New Energy Co. of Indiana v. Limbach* (1988) 486 U.S. 269, 273-274 [108 S.Ct. 1803, 1807-1808, 100 L.Ed.2d 302].) The commerce clause has not been interpreted to disable states from attempting to meet anticipated environmental perils, even if those perils are only imperfectly understood. (*Maine v. Taylor* (1986) 477 U.S. 131, 148 [106 S.Ct. 2440, 2452-2453, 91 L.Ed.2d 110].)

■ Plaintiffs cannot prevail with their claim that the Ordinance violates the commerce clause. There is nothing in the language of the Ordinance suggesting that it is differentiating between personal watercraft based upon their origin or site of manufacture. There is consequently no basis for concluding that it discriminates against out-of-state economic interests. (See *Oregon Waste Systems, Inc. v. Department of Environmental Quality of Ore.*, *supra*, 511 U.S. 93, 99 [114 S.Ct. 1345, 1349-1350]; *Wyoming v. Oklahoma*, *supra*, 502 U.S. 437, 455 [112 S.Ct. 789, 800-801].) The Ordinance regulates

---

[9]We note that federal authorities have seen fit to ban personal watercraft in marine sanctuaries such as Gulf of the Farallones National Marine Sanctuary (15 C.F.R. § 922.82 (2001)) and the Monterey Bay National Marine Sanctuary (15 C.F.R. § 922.132 (2001)); see also *Personal Watercraft v. Dept. of Commerce* (D.C. Cir. 1995) 48 F.3d 540). The Gulf of the Farallones National Marine Sanctuary takes up a considerable portion of the western coast of Marin County. There is no reason to believe that federal authorities would object to a county ban of personal watercraft in waters adjacent to those already covered by the existing federal ban.

evenhandedly and, because plaintiffs' facial challenge permits no evidence of what impacts, if any, the Ordinance will have on interstate commerce once it is put into operation, plaintiffs have not established that it is an undue burden on interstate commerce. (E.g., *General Motors Corp. v. Tracy* (1997) 519 U.S. 278, 300 [117 S.Ct. 811, 824-825, 136 L.Ed.2d 761]; *Fry Roofing Co. v. Wood* (1952) 344 U.S. 157, 161-163 [73 S.Ct. 204, 206-208, 97 L.Ed. 168].)

The judgment is reversed.

Reardon, J., and Sepulveda, J., concurred.

The petition of plaintiffs and respondents for review by the Supreme Court was denied October 16, 2002.